THE TERRITORY OF OKLAHOMA *ex rel.* S. ᴿ. ᴡᴜᴜɴGS, *County Attorney of Grant County,* v. T. P. NEVILLE, H. M. BREWER, J. M. COREY, *as the Board of County Commissioners of Grant County et al.*

(Filed March 23, 1900.)

1. BOARD OF COUNTY COMMISSIONERS—*Judicial and Ministerial Acts.*— The action of the board of county commissioners in ordering an election to determine the location of a county seat is a ministerial act, and not a judicial decision, from which an appeal lies to the district court.

2. REMOVAL OF COUNTY SEAT. Section 14, Indian Appropriation Act, approved March 3, 1893, providing for the reservation by the secretary of the interior of certain lands for county seat purposes, and the action taken thereunder by the United States, is not such an exercise of authority over the subject as to render the enactment of the Territorial legislature void, which grants the right to the people of the county to change the location of the county seat by vote.

(Syllabus by the Court.)

*Error from the District Court of Garfield County; before Jno. L. McAtee, District Judge.*

A. M. *Mackey* and R. B. *Forrest,* for plaintiff in error.

W. M. *Whitelaw* and D. S. *Dill,* for defendant in error.

STATEMENT OF THE CASE

On the 5th day of April, 1899, at the regular April meeting of that year of the board of county commissioners of Grant county, Oklahoma, there was presented to such board a petition, signed by two-thirds of the legal voters of the county, whose names appeared upon the tax rolls of said county, as shown by the poll books for the

election last held in such county, praying for a special election to determine the question of changing the location of the county seat in said county of Grant. The board at such regular session decided that the petition contained the requisite number of signers who were legal voters and whose names appeared upon the tax roll of said county, and granted the prayer of the petition, and ordered that a special election be held in said county of Grant, on the 16th day of May, 1899, for the purpose of determining the change of location of the county seat of said county, and ordered that the proposition to locate or relocate and change the location of the county seat be submitted to the voters at said special election. Within twenty days after said determination and the making of said order, calling said special election, seven resident tax payers of the county petitioned the county attorney of the county to appeal from the decision and order of the board of county commissioners in said matter, and the county attorney, pursuant to said petition, filed a notice of appeal in the name of said county of Grant, served the same upon the commissioners, and duly filed the same in the office of the clerk of the district court on the 24th day of April, 1899. Within twenty days after the making of said decision and order by the board F. J. Gentry, a resident and citizen of said county of Grant, also filed his notice of appeal from said order, which was also duly served on the commissioners, and filed in the office of the clerk of the district court. The city of Pond Creek also took an appeal from the said order, in the same manner. On the 24th day of April, 1899, the Territory of Oklahoma, on the relation of S. P. Ridings, county attorney of said county of Grant, filed its petition in the office of the

clerk of the said district court, for the purpose of enjoining the holding of the election called by the board of county commissioners as aforesaid, and concluded the petition with the following prayer, to-wit:

"Wherefore, the plaintiff prays that the court will grant a temporary injunction, restraining and enjoining said defendants, and each of them, from holding said special election, and from taking any steps of whatsoever nature toward calling, providing for and holding said special election, and on a final hearing of this case that said temporary injunction be made perpetual, and that the plaintiff have such other and further relief as to the court may seem proper and just, and for costs."

The board of county commissioners, the county clerk, and the trustees of the various townships of said county of Grant, were made parties defendant in said suit. Application was duly made by the plaintiff to the presiding judge of the district court in the district of which Grant county forms a part, said application being made at his chambers on the 27th day of April, 1899, asking for a temporary injunction according to the prayer of the said petition.    Application was denied, exceptions taken by the plaintiff, and the ruling of the judge, denying the temporary injunction, was brought to this court for review, and various assignments of error made.

Opinion of the court by

IRWIN, J.:  It is contended by counsel for plaintiff in error that the district judge erred in refusing and denying the application for a temporary injunction, and this contention is based upon two grounds, viz.: first, that the action of the county board in ordering an election to determine the location of the county seat of Grant county was an appealable one; that an appeal was regularly and

legally taken, and that such appeal should act as a super-sedeas and, therefore, the temporary injunction should have been granted; second, that the order of the commissioners ordering an election is void, for the reason that the act of the territorial legislature, granting the right to make such order and to hold such election for the purpose of relocating county seats, is in conflict with the act of the congress of March 3, 1893, under and by virtue of which the secretary of the interior reserved and designated certain lands in Grant county for county seat purposes.

The first question that presents itself to the court is, was the order of the county commissioners an appealable order? The statute provides:

"From all decisions of the board of county commissioners upon matters properly before them there shall be allowed an appeal to the district court."

This leads to the question of what is meant in this statute by a decision. We take it that this means a final conclusion of any question requiring the exercise of discretion, and does not intend to include the decision of questions purely ministerial. Now, in determining whether the order of the county commissioners in this case was appealable or not, we must first consider the question they were called upon to decide, and whether it was of such a nature as to leave room for the exercise of any discretionary powers in deciding it; or was it one purely administrative in its nature and ministerial in its character? The section under which this order was made was sec. 2 of ch. 23, Laws of 1893, and reads as follows:

"SECTION 2. If at any regular session of the county commissioners, there shall be presented to such commissioners a petition asking that the question of locating

or changing the location of the county seat be submitted to the voters of the county, signed by two-thirds of the legal voters of the county whose names appear upon the tax rolls of said county, the commissioners shall make the order therefor as hereinafter provided; provided, however, that where a county seat has been located at any place, no election to change the same shall be held for the space of five years from and after the taking effect of this act.

"Sec. 3.    When the petitions are so presented, the county commissioners shall determine from the poll books of the election last held in their county, the number of voters in the county; if the poll book be lost or destroyed, then by the record in the county clerk's office, showing such vote.

"Sec. 4.    For the purpose of enabling the county commissioners to determine whether or not the persons named signed to the petitions are legal voters in the county, the petitions presented to them shall, each one, contain the name of resident legal voters in one congressional township only, and shall be verified by the affidavit of one or more resident voters of that township or town, to the effect that they know the signers thereof, to be each and all of them resident voters of that township, or that they know parts of them so to be, naming the ones so known to them.    Different persons, resident voters of the township, may swear that different persons who have signed the petition, naming them, are resident voters of the township and the names so sworn to on the various petitions presented from the several townships shall be added together, and if the total number so signing and sworn to are equal to three-fifths of the number of legal voters in the county as shown by the poll books or records in the clerk's office, it shall be sufficient evidence to the county board, and they shall be bound to make the order submitting the question."

It will be seen by an examination of the language used in these sections that there is nothing in the action

required therein of the county commissioners which calls for the exercise of any judgment or any discretion. The board do not act judicially on anything they may be called upon to do under this law.

Section 2 provides that the petition for a county seat election must be "signed by two-thirds of the legal voters of the county, whose names appear upon the tax rolls of said county." This section does not leave it for the commissioners to say whether the said petition does contain the names of two-thirds of the legal voters of the county or not, but provides that this fact must appear from an examination of the tax rolls of the county.

Section 3 provides that the county commissioners shall determine from the poll books of the election last held in that county the number of voters in the county. This section does not even leave the question of the number of legal voters in the county to the county commissioners, nor give them any power to take evidence to determine this question, or the exercise of any discretion as to when and under what circumstances this fact has been proven. There is nothing of a judicial nature in this determination. The commissioners simply take the poll books, count the number of voters who voted at the last election held in that county, and by a mathematical, and not a judicial process, determine this question. This is purely a question of arithmetic, and not a question which involves any judgment or discretion on the part of the commissioners. It is simply a question of counting up and determining as a mathematical proposition just what the poll books show, and in this way only, the law allows and permits the commissioners to determine the number of voters in the county, and where the petition when measured and determined in this way meets the requirements

of the statute, then to ascertain whether or not persons who have signed said petition are legal voters. The question is not left in any way to the discretion of the commissioners, but the law makes it their duty to look solely to the affidavits attached to the petition. What the affidavits show must be accepted as absolute facts. Under the provisions of the law the affidavits import absolute verity, and the commissioners have no power, right, or discretion to determine their truth or falsity. The requirements of the statute are mandatory. If all the signers so sworn to by said affidavits, when added together, make a number equal to three-fifths of the number of voters found on the poll books, then the commissioners are bound to call the election. (There seems to be a conflict between sections 2 and 4 as to the number of signers required, but that is immaterial in this case, as the petition shows upon its face the number of signers thereon was more than two-thirds of the legal voters of the county.)

Now, in this matter it seems to us the commissioners have no discretion. They must act in a certain way, under the terms of a mandatory statute. They add together the names appearing upon the poll books; then they add together the names sworn to on the various petitions, and if the names so sworn to on the various petitions are equal to two-thirds of the names appearing on the poll books, then they must call the election. What they do involves no finding of fact; no determination of genuineness of the signature; no judicial investigation, but simply a mathematical calculation from sources pointed out by the law. Nor can they go outside of those sources and hear evidence of any kind. To say that such action and decision was judicial in its nature, you might as well

say that the results obtained by the use of an adding machine was a judicial act. We have examined the cases cited in the 4th Okla. and the 54th Pac. decisions of this court, which, it is contended, sustain the position of plaintiffs in error, that the order of the county commissioners in this case was an appealable order; but, we think, an examination of these cases will not bear out this contention. In both of these cases the question decided by the county commissioners was one involving a question of discretion, in which certain latitude was given that board to refuse or allow the order asked for, was not, as we think this case is, simply the operation of a mandatory statute. In the case in the 4th Okla. p. 701, it is declared in express terms that an appeal will not lie when the act of the board of county commissioners is purely ministerial.

In the case of *Herrick v. Carpenter et al.*, 54 Iowa, 340, which is cited by counsel for plaintiff in error as sustaining their position, the court say:

"In determining the sufficiency of a petition for the removal of a county seat and the genuineness of the signatures, thereto, the board acts in a judicial capacity," but an examination of the statutes of Iowa will show a decided difference between that statute and the statute of Oklahoma on this subject. The language in the Iowa statute, sec. 281, is as follows:

"SECTION 281. Where the citizens of any county desire a relocation of their county seat, they may petition their board of supervisors respecting the same at any regular session.

"SEC. 282. Such petition shall designate the place at which the petitioners desire to have the county seat relocated, and shall be signed by none but legal voters of said county, and shall be accompanied by affidavit sufficient to *satisfy* said board that the signers are all legal

voters of said county, and that the signatures on said petition are all genuine.

"SEC. 283. Remonstrances signed by legal voters of the county only, and verified in like manner as the petition, may also be presented to the board. If the same persons petition and remonstrate, they shall be counted only on the remonstrance; and if a greater number of legal voters remonstrate against the relocation than petition for it, no election shall be held."

It will be seen that this statute and the petition under it present many questions of a judicial character to the board of supervisors; that in passing on said petition there is large latitude given the board for the exercise of discretionary powers in determining the petition, and hence, there is a vast and wide difference between the provisions of that statute and our own; and a vast difference in the kind and character of duty or action required by their board of supervisors and our board of county commissioners in such matters.

In the state of Missouri they have a statute very similar to our own in regard to the removing of county seats. The act of 1865, (General Statutes of Missouri, ch. 36,) gives the county court power to proceed under a petition of one-fourth of the voters of the county to order the question of a removal of the seat of justice to be submitted to the qualified voters of the county at the next general election in the manner therein specified. And in the case of the *State ex rel. West v. The County of Clark et al.,* 41 Mo. 44, where this section of the statute is under consideration, it is held that the action of the county court is an administrative act, and is not the exercise of judicial powers, as the court in this case, say:

"The power given is made to depend upon the consent of at least one-fourth of the legal voters of the county,

and this consent is to be manifested in the mode prescribed by the act and in no other way."

In the case of *Farely v. The Board of Commissioners of Hamilton County*, 126 Ind. 468, it is held: ·

"If the act of the board is purely ministerial or administrative, no appeal lies."

In *Allen ex parte*, 26 Ark. 13, it is said:

"We cannot lose sight of the fact that appeals only lie from one court to another—not from an executive officer to a court. There must be a competent judicial tribunal to pass upon the case before an appeal can be taken to a higher court."

The court there cites in support of this authority, *Dunn v. State*, 2 Ark. 229.

In the case of *St. L. I. M. & S. Ry. Co. v. City of St. Louis*, 92 Mo. 165, it is said:

"An appeal can only be taken when the judgment or order appealed from is judicial."

And in the case above referred to in the 41st Mo. the court say:

"The county courts act as agents and in a ministerial character, and not judicial, in the matter of locating and removal of county seats."

In the case of *Platter v. The Board of Commissioners of Elkhart County*, 103 Ind. 361, the court say:

"When the board exercises judicial functions in adversary proceedings, involving private rights, there is a right of appeal, but such right does not exist when such board acts in a purely ministerial or administrative capacity."

If the contention of plaintiff in error that this order of the board of county commissioners was an appealable order, and that the appeal had been regularly taken, could be sustained, then we should have no doubt but

such appeal would operate as a supersedeas, and stay all subsequent proceedings pending such appeal; but we think that under the peculiar provisions of the statute by which they act, that this order of the county commissioners was purely a ministerial act, and was not in any sense a decision, such as contemplated by the statute granting the right of appeals from decision of the county commissioners. We do not think the act gives the commissioners any discretionary power, or leaves any latitude for the exercise of any judicial wisdom, but that their act is purely administrative and ministerial, and consequently is not such a decision as the law authorizes or allows an appeal from. And, in our judgment, the action or order of the county commissioners in this case from which an appeal is sought to be taken, was an interlocutory order, made intermediate to the presentation of the petition to the board, and the holding of the election. The object sought to be enjoined in this case was the changing of the county seat of Grant county from one location to another. This was the real object sought to be obtained in the asking for an injunction or temporary restraining order.

It is contended in plantiff in error's brief that to permit this election would incur large expense and entail heavy loss upon the tax payers of the county, but if the holding of such election and the subsequent removal of the county seat was illegal, or the act authorizing the same was unconstitutional, then no legal obligation or liability could be incurred against the county or the tax payers. One of the questions raised in this appeal could not have been raised in the action before the board of county commis-

sioners, to-wit: The question of the validity or constitutionality of the act of the territorial legislature, granting the order to submit the change or relocation of the county seat to the people of the county. The county commissioners were not a court in the sense in which the law permits such questions to be raised. Now, it would seem to us manifestly unjust to allow an appeal to this court and ask for a reversal of an order of the county commissioners upon a proposition of law, or on a point that could not be properly raised before said commissioners, or decided by them. It seems to us the law providing for county seat elections has made ample provision for a procedure by which all matters involving or affecting the legality or validity of either the election or the act of the legislature under which such election is held, may be investigated and fully tested provding a way in which an action may be directly brought for that purpose, and not made dependent upon collateral issues.

Sections 11 and 12 of ch. 23, Statutes of Oklahoma, 1893, p. 418, provides that all such elections and the validity thereof may be tested by proceedings in court by any legal voter in the county who desires so to do; and, thus it seems to us the taxpayers' liability for improper, unreasonable expense or taxation, may be met and tested. But it seems to us that to hold that an appeal lies from such an order of the county commissioners and operates as a supersedeas would lead to unjust and absurd consequences. Suppose every voter and tax payer except one in a given county should sign a petition for a county seat election, suppose the commissioners under such a petition should call the election. Now, suppose this one voter who did not sign the petition, should appeal from the

order calling the election. If we are to adhere to the contention of plaintiff, the whole proceeding would be immediately transferred into the district court. The time for holding the election as fixed by the commissioners might expire without an election. This might be repeated as many times as orders for a county seat election may be made, and thus a county seat election forever prevented, notwithstanding the legislature had enacted valid laws conferring the right to hold such elections. Another absurd consequence that would attend upon such holding, would be that the district court, a judicial tribunal, pure and simple, would be converted into a board of county commissioners, and made a forum for considering matters purely ministerial, and in no way judicial in their nature. Another reason why, in our judgment, the propositions announced by plaintiff and the authorities cited in their brief are not applicable in point to the case at bar, is because the states in which these decisions were rendered were sovereignties, with full power to vest judicial authority in their boards of county commissioners; while the Organic Act of the Territory of Oklahoma limits the exercise of the judicial powers of the Territory to the courts named, to-wit: the supreme court, district courts, probate courts, and justices of the peace. The true theory of county seat elections, and of the acts and doings of the county commissioners under county seat election laws of the Territory of Oklahoma, is that such elections are political in their nature; that they belong to the political department of the Territory; that the board of county commissioners, in calling such an election under the statute, are but employing the statutory means provided by the legislature to enable the people to exercise the polit-

ical right of holding a county seat election. And in the case of *Smith v. Adams*, 130 U. S. 167, the court say:

"The designation of the county seat of the county in Dakota, or providing for its designation by popular election, was a matter properly belonging to the legislative department of the territorial government. It was not a matter by itself for judicial cognizance. But when the law of the Territory left the designation of that the validity of the election could be contested by any competent elector of the county before the district court of the district within which the county was situated, upon leave obtained from such court for that purpose, and prescribed the mode in which such contest should be prosecuted by the contesting elector, and defended by the commissioners of the county under whose direction the election was held, and proofs be taken upon the matter in issue, and that the validity of the election should then be determined by the district court,—the designation of a county seat under the law became a subject of judicial cognizance, a case or controversy arising upon such proceedings being taken to which the judicial power of the Territory attaches."

This case arose in Dakota Territory, whose Organic Act is substantially the same as the Organic Act of this Territory. It seems to us that this authority, which is under substantially the same Organic Act as our own, is in point, and is conclusive as to the position we have taken that this order, which is necessarily an order submitting the question of change of county seat to a vote of the people, is not such a legal decision upon the part of the board of commissioners as is appealable.

But the objection presented in the second assignment of error is, in our judgment, one of more grave and serious consequences, and one not entirely free from doubt. It is there contended that the provisions of the

law authorizing the opening of the lands embodied in the Cherokee Outlet, of which Grant county is a part, for settlement, is in conflict with ch. 23 of the Statutes of Oklahoma 1893, relating to changing county seats, which is authorized by the Organic Act, which reads as follows:

"That the legislative power of a Territory shall extend to all rightful subjects of legislation not inconsistent with the constitution and laws of the United States."

It is contended that as the act of March 3, 1893, providing for the opening of this country to settlement, made provision whereby certain lands should be set apart and designated by the secretary of the interior for county seat purposes, was such an exercise of authority over the subject-matter as deprived the territorial legislature of the right of legislating upon this question, and that any attempted legislation upon the part of said legislature was void, as being in conflict with this act. The writer of this opinion is free to confess that his first impressions in regard to this case upon this point were strongly in favor of the doctrine laid down and enunciated by the chief justice of this court in the case of *George W. Allen et al., v. The Board of Commissioners;* but more mature reflection, and a more careful examination of the case, and a more complete and thorough examination of the authorities, has convinced him that his former views, as well as the views of the chief justice, on this subject, are not the correct ones, and are not sustained by the better reasoning, and the greater weight of authority.

Section 14, Indian appropriation act, approved March 3, 1893, vol. 27 U. S. Statutes, p. 645, provides that:

"Before any of the aforesaid lands are opened to settlement it shall be the duty of the secretary of the interior to divide the same into counties which shall con-

tain as near as possible not less than five hundred square miles in each county."

The lands referred to are, of course, in part, the lands embraced in the Cherokee Outlet. Said section also provides:

\* \* "That as soon as the county lines. are designated by the secretary he shall reserve not to exceed one-half section of land in each county, to be located for county seat purposes, to be entered under secs. 2387 and 2388 of the Revised Statutes, and all reservations for county seats shall be specified in any order or proclamation which the president shall make for the opening of the lands to settlement."

Thereupon the secretary of the interior divided the lands embraced in the Cherokee Outlet into seven counties, designated respectively as counties "K," "L," "M," "N," "O," "P" and "Q.' For county "L" he reserved for county seat purposes the s-w ¼ of sec. 1, and the s-e ¼ of sec. 2, township 25 north, range 6 west, I. M. in said county of "L." The president in opening these lands for settlement by his proclamation, bearing date August 19, 1893, (U. S. Statutes, vol. 28, p. 1,227) specified the above half section of land as having been reserved for county seat purposes by the secretary of the interior. County "L" is now Grant county, Oklahoma Territory, and the said half section of land reserved by the secretary of the interior for county seat purposes is the land on which the city of Pond Creek is built, from which it is sought to remove the county seat of Grant county by an election under ch. 23, Statutes of Oklahoma, 1893, which election plaintiff has attempted to enjoin. Said chapter 23 was enacted by the territorial legislature by authority of the first part of sec. 6 of the Organic Act of the Territory aforesaid, which reads as follows:

"The legislative power of the Territory shall extend to all rightful subjects of legislation, not inconsistent with the constitution and laws of the United States."

As above stated plaintiffs claim that the fact that by the act of congress and the president's proclamation thereunder the county seat of Grant county having been once located, and no express provision made in the act for changing the same, that consequently this legislation under and by virtue of said section 6 of the Organic Act is in conflict with said act of congress and consequently void. For a more definite understanding and proper in-terpretation of this act of congress, which it is claimed is in conflict with the legislative enactments of the Ter-ritory, it would be well to consider the language of this act in the light of the laws in force in the Territory at that time. When the Organic Act, which is termed "An Act for the Purpose of Facilitating the Organization of a Temporary Government in the Territory of Oklahoma," was passed May 2, 1890, Oklahoma had no government of its own. There were no counties or divisions of its lands, except such as were made by the government survey. The Organic Act was passed to give it a government, and it was a very thoughtful and convenient thing for con-gress to establish counties in these lands. The counties thus established, being seven in number, are in such act named numerically, and county seats located in each county. This is the Territory that is now commonly known as "Old Oklahoma." Congress then further pro-vided in this same act "That the county seats located by this act may be changed in such manner as the territorial legislature may provide."

This provision will suggest to the thinking mind two reasons for its enactment—reasons which, no doubt, pre-

sented themselves very forcibly to congress; first, to em-
phasize the declaration that the counties were established
and county seats located, at least temporarily; and sec-
ond, that the people ought to be allowed to change those
conditions without being confronted with the suggestion
that as the counties were established and county seats
located by the Organic Act of the Territory, perhaps any
desired change could not be authorized by the territorial
legislature,—the very identical question that is raised in
this case. Now, in the course of time it became necessary
or was thought advisable by the United States govern-
ment to enlarge the Territory of Oklahoma by adding the
Cherokee Outlet, and the government having already pro-
vided a government for the Territory of Oklahoma, hav-
ing shown in its Organic Act the disposition of congress
toward counties and county seats, having provided in such
act that the legislative power of the Territory should
extend to all rightful subjects of legislation, congress
passed the act of March 3, 1893, heretofore mentioned, in
which the secretary of the interior was directed to estab-
lish counties in the lands to be opened, and to reserve in
each county lands to be located for county seat purposes.
Now, the first question that presents itself to the mind
of the court is: Is the location or relocation of a county
seat a proper and rightful subject of legislation by the
territorial legislature? We have no hesitation in saying
that in the absence of any express or necessarily implied
prohibition on the part of the constitution and laws of
the United States, this subject would be a proper and
rightful subject of legislation. While it is true that the
residents of a Territory derive no constitutional rights
or privileges by virtue of their territorial government,
except such as are by express or direct implication given

them by the United States government, still we take it that no citizen of the United States is clothed with any less authority, or deprived of any rights as such citizen of the United States, by virtue of the fact that he is a resident of Oklahoma Territory or any other territory of the United States; that he has all the rights of an American citizen, and is restricted only in the exercise of such rights and privileges as for the common good have been surrendered into the hands of the United States government, for the proper exercise and carrying out of a constitutional form of government in the community in which he lives. We take it that the Territorial legislature, being the representatives of the people of the Territory, have the right to legislate for the people upon all subjects which are not in conflict with the constitution of the United States, and do not in any way interfere with the supreme right of the United States government, to direct and control the governmental affairs of the Territory. Now it would seem to us that it was a matter of very little moment to the people of the United States, in general, as to where or at what particular point or place, the seat of government of any county in the Territory of Oklahoma was located, but would be a matter which more directly and materially affects the rights, convenience, and interests of the people who lived and had their homes in the particular county to be affected. That this is a rightful subject of legislation we think an examination of the various laws passed by the United States government on the subject will show, and that it has been so considered by the United States. By the act of July 30, 1886, prohibiting the passage of local or special laws in the territories of the United States, locating and changing county seats, the United States recognizes this as a rightful sub-

ject of legislation at the hands of the territorial legis-
lature.  If it was not a proper subject of legislation and
one which the territorial legislature had a right to make
laws conscerning, why should it be necessary to prohibit
the making of particular laws,—such as local or special
laws?  Does it not follow that by prohibiting local or
special laws, general laws may be legally enacted?  We
think there can be no serious difference of opinion among
lawyers, or, for that matter, among laymen, that this is a
proper and rightful subject of legislation on the part
of the territorial legislature, unless such legislation is in
conflict with the act of congress, and the proclamation of
the president in opening such lands for settlement.  In
determining whether there is this conflict, we  should
strive to get at the legislative intent.  Did the congress
of the United States intend the location of county seats
in these seven counties of the Cherokee Outlet to be per-
manent, fixed and unchangeable legislation, or was it in-
tended merely to provide a temporary  condition,—this
condition to exist in each of the new counties until the
people of any county should desire to change the condition
by an election held under the laws of the Territory,
passed by authority of the Organic Act?  To adopt the
theory that such intention was to establish such couty
seats permanently, would be to hold that in the Territory
of Oklahoma, at the present time, this condition prevails.
Chapter 23, of the Statutes of Oklahoma, 1893, whi h
purports to be a general statute applying with equal force
to all parts of the Territory would be valid and binding as
to the seven counties organized, of what is known as "Old
Oklahoma," and would be void as to the seven
new counties created out of the Cherokee Out-
let.  In other words, Old Oklahoma could hold

county seat elections in any or all of the seven counties, and the law would be valid, constitutional and binding, but as to the seven new counties embraced in the Cherokee Outlet, although for all purposes they are parts of the same Territory, this act would be unconstitutional and void, and no county seat election could be held. In other words, does the act of March 3, 1893, repeal the Organic Act in reference to locating or relocating of county seats? This section of the Organic Act which gives the right to submit to a vote of the people the changing of a county seat, was a part of the law of Oklahoma at the time of the passing of the act of March 3, 1893, by which Grant county became a part of the Territory of Oklahoma, and such section of the statute would be binding and in full force, and apply as well to Grant county, as to the seven original counties of Oklahoma, unless such act was repealed by the act of March 3, 1893. It is a well recognized principle of law, that repeals of statute by implication are not favored in law. Now, a reading of this act opening the Cherokee Outlet will show that there is no language employed in such act which amounts to an express repeal of the Organic Act. Now, is there language which, by a fair interpretation, repeals the same by implication? In *McCool v. Smith*, 66 U. S. 222, it is said.

"A repeal by implication is not favored. The leaning of the courts is against the doctrine, if it be possible to reconcile the two acts of the legislature together."

In the *United States v. Tynen*, 78 U. S. 153, the court say:

"When there are two acts of congress on the same subject, and the last embraces all of the provisions of the first, and also new provisions, and imposes different or additional penalties, the latter act operates, without

any repealing clause, as a repeal of the first," but no such conditions exist as to the two acts of congress in question in this case.

In the *United States v. 336 Caddies of Tobacco*, 78 U. S. 235, the court say:

"A statute is impliedly repealed by a subsequent statute only so far as the provisions of the subsequent statute are repugnant to it, or so far as the latter statute making new provisions is plainly intended as a substitute for it. Where the powers or directions under several acts are such as may well subsist together, an implication of repeal cannot be allowed."

In the *Town of Red Rock v. Henry*, 106 U. S. 596, the court say:

*   *   "When an affirmative statute contains no expression of a purpose to repeal a prior law, it does not repeal it unless the later statute covers the whole ground occupied by the earlier, and is clearly intended as a substitute for it, and the intention of the legislature to repeal must be clear and manifest."

And that where two acts are passed, one to "authorize the towns in a certain group of counties to aid in the construction of one line of railroad, and the other to authorize the towns in another group of counties to aid in the construction of another line of road," and one county is common to both groups, the later act does not repeal the older act, either totally or partially, as to such county.

In the act in question, it seems to us if it had been the legislative intent of congress in making such act to have repealed in whole or in part the Organic Act, governing the Territory of Oklahoma, previously passed, or limiting or abridging its application to said Territory, or any part thereof, they could have, and undoubtedly would have used language clearly, concisely and unmistakably indi-

cating such intention. There being no such intention expressly manifested or that can reasonably be implied from such act, we take it that there was no intention on the part of congress in passing said act to repeal or in any way restrict or limit the operation of the Organic Act. Now, the question is, does the Organic Act in its full force and effect, and in all its parts and terms, apply as well to the seven counties in the Cherokee Outlet as to the other parts of the Territory of Oklahoma? That it does, we think a careful reading of the act of March 3, 1893, will convince. Among the various provisions in such act we find in sec. 10, of the act this language:

"The president of the United States is hereby authorized at any time within six months after the approval of this act and the acceptance of the same by the Cherokee Nation as herein provided, by proclamation, to open to settlement any or all of the lands not allotted or reserved, in the manner provided in section 13, of the act of congress, approved March 2, 1889, entitled: 'An Act, Making Appropriations for the Current and Contingent Expenses of the Indian Department, and for Fulfilling Treaty Stipulations with Various Indian Tribes, for the Year Ending June 30, 1890, and for Other Purposes,' and also subject to the provisions of the act of congress approved May 2, 1890, entitled: 'An Act to Provide a Temporary Government for the Territory of Oklahoma, to Enlarge the Jurisdiction of the United States Court in the Indian Territory, and for Other Purposes.' "

This act is called an act to open the Cherokee Outlet, and is so designated in the Statutes of Oklahoma, 1893, at p. 71. The act referred to as the act of May 2, 1890, and as an act entitled: "An Act to Provide for a Temporary Government for the Territory of Oklahoma, to Enlarge the Jurisdiction of the United States Court in the Indian Territory, and for Other Purposes," is our Organic Act.

Now, It seems to us by this language congress intended, in providing a temporary government for the Territory of Oklahoma, to embrace the Cherokee Outlet, and to make the Organic Act of Oklahoma heretofore adopted, to-wit: On May 2, 1890, to cover the entire domain of said Territory, including this Cherokee Outlet. In determining the legislative intent in this matter, let us look for a moment at the language employed. They say that when his land is opened for settlement to-wit: six months after the approval of the act, and its acceptance by the Cherokee Nation, that the lands in the Cherokee Outlet shall be opened for settlement, subject to what? Subject to the provisions of the act of congress of May 2, 1890, entitled: "An Act to Provide a Temporary Government for the Territory of Oklahoma," which, in other words, is the Organic Act. Now, what does it mean to be subject to the Organic Act. The word "subject" is defined by Webster as taken from the Latin word "subjectus," meaning lying under. Webster gives the meaning of the word "subject" to be placed or situated under that in which any quality, attribute or relation inheres, to bring under the power.—Webster's Unabridged Dictionary.

Now we think it reasonable to presume that the congress of the United States in using this language in this act, intended that it should be understood and construed in its common, ordinary acceptation. There is no manifest intention to give it any technical, scientific or other or different meaning than the common, ordinary acceptation of the term. That being true, congress said that the lands in the Cherokee Outlet, when they were opened to settlement, should be placed or situated under the Organic

Act of the Territory, and that all the provisions, regulations, requirements and benefits of the said Organic Act should apply to and have full force and effect in every and all the counties composing the said Cherokee Outlet, and that the act of congress opening this land to settlement is in no way in conflict with, or in no manner repeals or abrogates this act of the territorial legislature. Now, if this land was to be brought under the power of this Organic Act, the Organic Act provides in express terms: "that the county seats located by this act may be changed in such manner as the territorial legislature may provide." Now, when the congress of the United States by the act of March 3, 1893, provided that these lands when opened for settlement should be subject to the provisions of this Organic Act, then this provision of the Organic Act applies with equal force to the seven counties of the Cherokee Outlet that it does to the seven counties of the original Territory of Oklahoma; and it seems to us that in order to hold any different view of this question, it would be necessary to lose sight entirely of this provision of the act which says in plain and express terms that the lands opened for settlement shall be subject to this act of May 2, 1890, entitled: "An Act to Provide a Temporary Government for the Territory of Oklahoma," viz.: the Organic Act. Hence, it seems to us that both by the act of congress and the proclamation of the president, the county seats were located in the counties of the Cherokee Outlet subject to all the provisions of the Organic Act, and placed under the same rule, subject to the same legal restrictions and entitled to the same legal benefits as the seven original counties named in the Organic Act, including that provision that gives the right to the territorial legislature

to provide by law how the county seats established shall be changed. It seems to us that under the clear unmistakable statements of the congress itself, as embodied in that act, every settler came into the Territory with the express guarantee on the part of congress that that territory and the lands then opened for settlement, was to be subject to the same law, governed by the same rules, and the residents of the counties of the Cherokee Outlet to have the same rights as are guaranteed by the Organic Act to the other parts of the Territory of Oklahoma.

For these reasons, we think, the decision of the district court in refusing the temporary injunction should be affirmed.

McAtee, J., who presided in the court below, not sitting; Burwell, J., concurring in the result, but not as to the reasons expressed; Burford, C. J., and Hainer, J., dissenting.