WILLIAM S. ROBERTSON AND JOHN A. BLAIR v. THE BOARD OF COUNTY COMMISSIONERS OF GRANT COUNTY AND THE CITY OF POND CREEK.

(Filed September 3, 1904.)

1. COUNTY SEAT ELECTION—Who May Contest. Where an election has been held under the provisions of chapter 23 of the Statutes of 1893, for the purpose of removing a county seat, and from the face of the returns it appears that a majority of all the votes were not cast in favor of any one town, and the county commissioners have ordered a second election, such order is, in effect, so far as the first election is concerned, an order directing that the county seat remain at its original location, and the legality of the first election may be tested by a legal voter in the county if he

shows by his petition, by proper allegations, that a majority of all the legal votes at such first election were cast in favor of his candidate; it being the intention of the legislature that a majority of the votes cast shall control, no matter whether they shall be cast at the first or subsequent election.

2. PRACTICE—Petition Insufficient, When. A petition in an action to contest an election which alleges generally that the judges and clerks of election permitted a certain number of illegal votes to be cast in favor of a certain town for county seat, and that without such illegal votes the plaintiffs' candidate would have been elected, and setting out the number of votes which the petitioner claims each candidate legally received and which, if correct, would give to the petitioners' candidate a majority of all of the legal votes cast, is not sufficient to state a cause of action. The pleader must set out the facts from which the court can say as a matter of law that the votes were illegal, and that without such illegal votes the result of the election would have been in favor of plaintiffs' candidate.

3. SAME—Validity of Statute Will Not be Passed Upon, When. Where a plaintiff brings a suit under a territorial statute, and the defendant on the trial objects to the introduction of any evidence by the plaintiff, for the reason that the petition fails to state a cause of action, the court should first determine as to whether the plaintiff's petition is good, conceding the validity of the statute, and if not sufficient the objection should be sustained without passing upon the power of the legislature to enact the law, it being the rule that a court will not pass upon the power of the legislature to enact a law until some one comes into court who shows by his pleadings that he is entitled to the benefit of its provisions.

(Syllabus by the Court.)

*Error from the District Court of Garfield County; before James K. Beauchamp, Trial Judge.*

*Joseph Wisby, Cotteral & Hornor, H. J. Sturgis, F. C. Walling* and *D. M. Tibbetts*, for plaintiffs in error.

*A. M. Mackey, John W. Shartel* and *W. S. Denton*, for defendants in error.

Opinon of the court by

BURWELL, J.: We are asked to determine the rights of the voters of one of the counties located in the Cherokee

Strip to change its county seat under the provisions of chapter 23 of the Statutes of 1893. This identical question was passed upon in the case of the *Territory of Oklahoma ex rel Ridings, County Attorney, v. Board of County Commissioners,* 10 Okla. 79, in whch the rule was announced, (Justice Irwin writing the opinion) that the act of the legislature authorizing such change was valid, and was not in excess of the legislative power, while on the other hand on the same day that this opinion was adopted by the court it also handed down an opinion, (Justice Hainer speaking for the court, and who still adheres to his views as therein expressed) in the case of *George A. Allen v. County Commissioners.* 10 Okla. 105, in which it is stated that congress located the county seats in the "Strip" counties; and, it having acted on the matter, exhausted the subject, and that any act of the Territorial legislature looking toward the removal of those county seats is unauthorized, and therefore void. Chief Justice Burford concurred fully in both the judgment and the reasons given therefor in this last opinion. Justices Irwin and McAtee and the writer of this opinion concurred in the judgment, and Justice McAtee filed a separate opinion.

There were controlling reasons for the judgment in each of those cases independent of the question of the validity of the act authorizing the removal of county seats, and while each of the other justices expressed his opinion as to whether or not the statute was valid or invalid, the writer concurred in such judgments without intending to decide that question, believing it unnecessary to do so in either of those cases.

Hence it cannot be said that those decisions or either of them have settled the question as to whether or not the

voters may remove a county seat, as in each of those cases the reasoning upon that question was concurred in by a minority of the court as then constituted, and therefore this case will be decided without regard to anything said therein upon that subject.

An election having been held by the voters of Grant county, and the returns canvassed by the board of county commissioners, that board found that a majority of the votes had not been cast for any one town, and therefore ordered another election, which appellant contends should not have been done, as a majority of the legal votes were cast in favor of Medford. The trial court held that a contest could not be entertained by the court until after the board of county commissioners had formally declared the result in favor of some particular town, either on the first or subsequent election. To determine this question intelligently, it is necessary to examine the different provisions of the Statute of 1893 in which the act is found. By section 1822, the legislature provided the form of the ballot, and further declared that if at the first election a majority of the votes cast shall be for any one town, it shall be the county seat, and within ninety days the records shall be removed to such point, and the county seat established there, but if a majority of all the votes cast shall not be for one town, then a second election shall be held. Then section 1825 provides:

"If on such canvass the majority of the votes be for any one place at the county seat, it shall be the duty of the board of county commissioners to at once so declare and make a record thereof, and order the county seat to be established at the point chosen."

And then section 1827 confers the right to contest upon

any legal voter: "If any legal voter in the county desires to test the legality of the election so held, and the removal of or the right to retain the county seat at the point to which it may have been so voted and established, they shall have the right so to do by proper proceedings in court, but such proceedings shall in no manner interfere with the removal or location of the county seat. If it finally be decided that such was wrongful, then the county seat shall be returned to the place from whence it was removed."

It is insisted by appellee that unless an order is entered by the board of county commissioners establishing the county seat at some particular town, no contest will lie. Ordinarily this contention would be correct, but it is subject to exceptions. The presumption is that an election has been regularly held, and that no fraud has been committed; but suppose, as is claimed in this case, the majority of all of the legal votes were cast in favor of Medford, but that illegal votes were cast in favor of the other towns which fraudulently prevented a majority of the legal voters from locating the county seat. Can the will of the majority of the honest voters be defeated by such fraud? We think not. It was the intention of the legislature that when a majority of the legal votes were in favor of a particular town on the first election, no second election should be held; and if Medford received a majority of the legal votes at the first election, and the commissioners did not declare it the duly elected county seat, and ordered a second election, such order would be a refusal to order the removal of the county seat, within the spirit of the law; and we are clearly of the opinion that a voter may test the legality of the first election under the facts of this case, the same as he could test the result of

the second- election after those results shall have been de-
clared.   All the law requires is that a majority of the legal
votes be in favor of one point, and if that majority is se-
cured on the first election, why hold a second?   It was not
intended that a competition for the county seat should have
a majority of all of the votes in two elections; or, having
secured a majority in the first, should take the chances of
losing in the second.   We frankly admit that the right to
test the legality of the election is purely a statutory right,
but statutes should always be construed so as to carry out
the object sought to be attained by the legislature, and the
object of the legislature was to permit the majority of the
legal voters to control, no matter whether their intention
was expressed on the first or second election.   We think the
statute expressly authorizes the contest in this case.   At least
the intent to authorize it is clear and unmistakable, and to
deny it would be a recognition of empty technicalities, and
would destroy the fundamental rules of construction..   Nor
is this all.   It is contended that hundreds of illegal votes
were cast in favor of Pond Creek, and that those illegal
votes prevented the commissioners, on the face of the re-
turns, from ordering the county seat changed to Medford.
If this is true, the courts should not aid Pond Creek in
the perpetration of this fraud, by adopting the interpreta-
tion contended for, especially when such interpretation would
be a standing invitation to adopt the same fraudulent meth-
ods in the future.   If, by stuffing the ballot box, Pond Creek
can prevent any other town from procuring a majority of
the votes on the first election, it can prevent indefinitely the
removal of the county seat, no matter how often the majority

should declare in favor of another town. The interpretation contended for not only invites fraud, but protects the perpetrators in the fruits of the same, while the one here laid down compels an honest election, and enforces the spirit of the law. It expresses, in our judgment, the legislative intent.

The deciding of this point, however, does not control the judgment that ought to be rendered. A demurrer was filed to the petition, which was overruled and issues joined, but on the trial the defendant objected to the introduction of any evidence, for the reason that the petition failed to state a cause of action. The objection was sustained by the trial court, and judgment was rendered for the defendants below. Exceptions were properly saved. The court assigns two reasons for the judgment, with one of which we do not agree; but that the petition does not state a cause of action is certainly clear. The petition in this case alleges that the petition for the election was signed by 2423 *bona fide* legal voters; that the total number of legal electors in the county when the petition to the county commissioners was filed was 3205; that the town of Medford at the election in question received 2018 votes; that the town of Jefferson received 1028 votes, and that the town of Pond Creek received only 685 legal votes; that the town of Medford received a majority of 305 votes over and above both of the other candidates; that the judges and clerks of the township of Prairie allowed 201 illegal votes to be cast in that township for Pond Creek; that the judges and clerks of the township of Berry allowed 324 illegal votes to be cast for Pond Creek; that the judges and clerks of the first, sec-

ond, third and fourth wards of the city of Pond Creek allowed 424 illegal votes to be cast for Pond Creek; that children and women in the city of Pond Creek and in Prairie and Berry townships, who were not legal voters, voted at the election; that the poll books of Prairie township were not signed by the judges of the election; that the clerks who kept the poll books did not take the oath as required by law; that at the election there were 850 illegal votes counted for the city of Pond Creek, and that they should have been rejected; that by reason of the fraud perpetrated by the judges and clerks of the townships of Prairie and Berry, and the city of Pond Creek, the town of Medford did not receive a majority of the votes cast at the election, as shown by the poll books; and that the city of Pond Creek, by threats and intimidations, illegally and fraudulently holds the county seat.

The most of these statements are mere conclusions of law, and not statements of fact. The statement in the petition is that: "Illegal votes were cast and counted for Pond Creek." If illegal, for what reason? Were they voted by persons who were not residents or by persons who had theretofore voted in that same election. It is not sufficient to allege that the votes were illegal. The pleader should state the facts from which, if true, the court can say and find that the votes are illegal in law. It is true that the petition states that women and children voted at the election, but the number of women and children who voted is not stated. It is alleged, though, that these votes, when added to the other illegal votes, made the total number of illegal votes in Prairie and Berry townships and Pond Creek

850; but that is not sufficient. We had occasion to consider the requisite allegations of a petition in an election contest in the case of *Roberson v .Hubler,* 11 Okla. 297, in which it was said:

"It is not necessary to allege the facts as to each particular ballot which will show that it should be counted. General allegations which show that 'a certain number of ballots were legal ballots, that they were cast by persons qualified to vote at such election, (stating the facts which show their qualifications) that such ballots were cast for the plaintiff, and that the judges of election wrongfully rejected them as mutilated ballots, when in fact they were not mutilated ballots, and should have been counted for plaintiff,' is sufficiently definite and certain; and if the petition contains all other requisites and the number of ballots rejected as mutilated, and which the petition alleges are not mutilated, is sufficient to elect the plaintiff, it states a cause of action; and the petitioner is entitled to have the ballots counted, even though the petition fails to state that the ballots were fraudulently rejected."

From this case the rule is settled that a contestant is not required to allege the facts as to each separate ballot, unless the particular facts will apply to a specific ballot only; but if there are a number of ballots to which the same allegations will apply, the pleader may adopt them; but whether the allegations apply to one or to many ballots in the same class, the pleader must state the facts from which, as said before, the court may determine, as a matter of law, as to whether they are illegal. The law presumes that all of the votes were legal, and that the election was regular, and he who claims fraud must both plead and prove it. Unless he first pleads fraud by proper averments, his proof when

offered will be denied. Nor can the allegation that the judges did not sign the returns, or that the clerks did not take the oath as required by law, aid the appellant. If these returns are not entitled to be counted, how many votes from these precincts did Medford receive, and which helped to make the 2018 votes claimed? The pleader should have informed the court. It is admitted in the petition that the face of the returns show that Medford did not receive a majority of all the votes cast, and we are unable to say from this pleading how many votes, if any, were cast in circumstances that would prevent them from being legally counted. Entertaining these views, the judgment must be for the appellee, and as the plaintiffs below failed to file a petition which states a cause of action, it is immaterial to them whether the statute authorizing a change of a county seat is in conflict with a law of the United States or not. Whether valid or invalid, they have not filed such a pleading as will justify the courts in granting any relief, and as the validity of the statute might be presented in a contest over a second election, its validity or invalidity being immaterial to the decision in this case, we deem it inadvisable to discuss our views in relation thereto at this time, as it is the general rule that courts will not declare a law to be unconstitutional until a case is presented in which such determination is necessary to its disposition. One who has failed to show by his pleading that he is entitled to the benefits of a statute, or to be relieved from its burdens, is not entitled to have a court declare such statute to be invalid. If the rule were otherwise, courts would be kept busy determining controverted theories instead of settling rights of litigants.

For the reasons herein stated, the judgment of the lower court is hereby affirmed, at the cost of the appellant.

Beauchamp, J., who presided in the court below, not sitting; Pancoast, J., absent; all the other Justices concurring.

By BURFORD, C. J.: I concur in the results in this case, but not for the reasons stated in the opinion. In my judgment the act of the legislature authorizing the removal of the county seat in this case, is unauthorized, and is of no force or effect, and the plaintiff cannot maintain any action under its provisions. The demurrer was rightfully sustained.