## KEWANEE OIL & GAS CO. v. MOSSHAMER.
### No. 566.

Circuit Court of Appeals, Tenth Circuit.
April 22, 1932.

Rehearing Denied May 25, 1932.

A. A. Davidson, of Tulsa, Okl. (West, Gibson, Sherman, Davidson & Hull, of Tulsa, Okl., on the brief), for appellant.

John T. Craig, of Pawhuska, Okl. (Frank T. McCoy, of Pawhuska, Okl., on the brief), for appellee.

Before LEWIS and COTTERAL, Circuit Judges, and VAUGHT, District Judge.

VAUGHT, District Judge.

The appellee, as plaintiff below, recovered a judgment against the defendant (appellant) based upon damages to plaintiff's cattle caused by the said cattle drinking salt water which defendant had permitted to escape from an oil well, and by seepage from the tank into which salt water was piped; said salt water being permitted to flow over plaintiff's pasture and into a stream and pool used by the plaintiff to provide drinking water for his cattle, some of said cattle dying and many becoming ill and diseased. The appellant relies upon five assignments of error: (1) That section 7969, C. O. S. 1921, in so far as it provides "Salt water shall not be allowed to flow over the surface of the land," is violative of the provisions of the Constitution of Oklahoma; (2) that the prohibition against permitting salt water to flow over the surface of the land is not a legitimate exercise of police power; (3) that the statute was not violated by the seepage of salt water from a pond in which it was retained and which was constructed and maintained in accordance with the regulations of the Department of the Interior which had jurisdiction of appellant's lease and its operation; (4) that the evidence fails to establish that salt water was the cause of the injuries complained of, but in fact the contrary was established by the testimony of the only competent and qualified witnesses on the question; (5) that the amount of damages found by the jury is excessive.

Under the first proposition, it is vigorously contended by the appellee that the constitutionality of section 7969 could not be raised as it was in this case, by an objection to the introduction of testimony, for the reason that, since section 7969 is unconstitutional, the plaintiff's petition failed to state a cause of action.

"This practice is very objectionable and is not recognized in the national courts of this jurisdiction." United Kansas Portland Cement Co. v. Harvey, 216 F. 316, 318 (8th C. C. A.); citing Boatmen's Bank v. Trower Bros. Co. (C. C. A.) 181 F. 804; Morris v. United States (C. C. A.) 161 F. 672. See, also, Walton Trust Co. v. Taylor (C. C. A.) 2 F.(2d) 342.

From the record it appears that the constitutionality of section 7969 of the Oklahoma Statutes was not raised by the pleadings or by demurrer, but at the time of the trial by an objection to the introduction of evidence.

"Complaint cannot be tested by objecting to introduction of evidence." Walton Trust Co. v. Taylor (C. C. A.) 2 F.(2d) 342.

"In considering a question affecting the constitutionality of an act, it is the court's duty to exercise some discretion in determining the time when it shall be presented. If not raised by the pleadings ordinarily it may not be raised at the trial." 12 C. J. 785.

"A presumption in favor of constitutionality is raised by the mere fact of the enactment of a statute by the legislature; and the burden of showing that it is unconstitutional is on the party asserting it." 12 C. J. 791.

"The question as to the constitutionality of a statute may be raised by answer or plea in bar, by a plea in abatement, or by plaintiff's reply; but under the rule requiring the invalidity to be distinctly pointed out, the question is not raised by a plea of the general issue." 12 C. J. 784. See, also, 12 C. J. 785.

"One who has failed to show by his pleading that he is entitled to the benefits of a statute, or to be relieved from its burdens, is not entitled to have a court declare such statute to be invalid. If the rule were otherwise, courts would be kept busy determining controverted theories, instead of settling rights of litigants." Robertson v. Board of County Commissioners of Grant County, 14 Okl. 407, 79 P. 97.

"Defendants suggest in briefs that if the statute is so construed it is invalid. The issue of constitutionality, however, is not raised in the answer (a mere general denial) and I do not consider it." 12 Corpus Juris, 784; U. S. v. Davis (D. C.) 50 F.(2d) 903.

"It is urged * * * the act * * * was unconstitutional because it was a special or local act, and no notice of its intended introduction was given as provided by section 32 of article 5 of the Constitution, but there was no allegation in plaintiff's petition that such notice was not given, and, in the absence of such an allegation, the presumption of law is, even though said act may be special or local, that when it was enrolled, authenticated, approved, and filed in the office of the secretary of state, its passage by the Legislature was regular, and that the proper notice was given." Byers v. Dunham, 50 Okl. 266, 150 P. 1049, 1051.

"The rule is well settled that a party who seeks to have a statute declared unconstitutional 'must affirmatively establish that the same impairs his rights and is prejudicial thereto.'" Currier v. Elliott, 141 Ind. 394, 39 N. E. 554; State v. Morris, 199 Ind. 78, 155 N. E. 198, 201.

We therefore conclude that the contention that the state statute is unconstitutional is an affirmative defense, and must be so pleaded in the answer. While it may be mere obiter dictum, yet, assuming that the unconstitutionality of the statute was properly raised, the constitutionality of this act has been determined. It was passed March 27, 1909 (Sess. Laws 1909, p. 431), which was embodied in the laws of 1910 as revised and adopted by the Act of March 3, 1911 (Laws 1910–11, c. 39), which took effect in 1913. The Supreme Court of Oklahoma has decided that this latter act made all contents therein valid, although the title to the act by which they were originally adopted by the Legislature may have been insufficient. Green et al. v. State, 33 Okl. Cr. 268, 243 P. 533.

This same act has been carried forward in the 1921 statutes, and we take the position that section 57, art. 5, of the Constitution, is fully complied with, which section is as follows: "Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes."

The next assignment of error is that, conceding the act to be constitutional, the prohibition against permitting salt water to flow over the surface of the land is not a legitimate exercise of police power.

"The question in each case is whether the legislature has adopted the statute in exercise of a reasonable discretion, or whether its action be a mere excuse for an unjust discrimination, or the oppression or spoliation of a particular class." Holden v. Hardy, 169 U. S. 366, 18 S. Ct. 383, 390, 42 L. Ed. 780.

" * * * And in the exercise of such [police] powers the state has wide discretion in determining its own public policy and what measures are necessary for its own protection and properly to promote the safety, peace and good order of its people." Terrace v. Thompson, 263 U. S. 197, 217, 44 S. Ct. 15, 18, 68 L. Ed. 255, 275.

Counsel for appellant cites Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 43 S. Ct. 158, 67 L. Ed. 322, but an examination of

this case is sufficient to show that it is not in point and has to do with an entirely different proposition.

"The police powers of a state extend to the protection of the lives, limbs, and health of all persons, and the protection of all property, within the state, and by which persons and property are subjected to all kinds of restraints and burdens for the protection of life, person and property, in order to secure the general comfort, health, and prosperity of the state." Patterson v. State, 7 Okl. Cr. 497, 124 P. 942, 946.

In the case of Verland Oil & Gas Co. v. Walker, 100 Okl. 258, 229 P. 235, 236, after quoting section 7969, C. O. S. 1921, the court said: "We deem it unnecessary to refer to the regulations of the Department of the Interior governing this subject. Said statutes come clearly within the police power of the state. Protection of the purity of the streams and lakes for the preservation of the life, health, and happiness of the people, as well as animal life, is the public policy of the state."

Without quoting the numerous other authorities on this proposition, I fail to see why the disposition of salt water, which is just as dangerous to vegetation and live stock as the oil or other refuse from the well, is not a proper matter for police legislation, and why its control would not be in the interest of health and the protection of life and property.

Under the third proposition, it is contended that seepage of salt water is not in violation of the statute, for the reason that the tank was an earthen tank constructed and maintained in accordance with the regulations of the Department of the Interior. The act prohibits the flowing of salt water over the surface of the land, without any exceptions whatever, and it would be immaterial, so far as its effect on the land is concerned, whether the salt water seeped from the tank in which it had previously been piped from the well or whether it ran over the surface of the land directly from the well itself, but, in addition, the evidence discloses that salt water was found dripping from the pipe and running down the hill into the creek where it stood in holes and pools. Therefore seepage was not the only means of escape for the salt water onto the surface of the land.

The fourth and fifth assignments are based upon fact.

In the summer and fall of 1929, the plaintiff was pasturing some cattle upon 1,-300 acres which he had under lease. In this pasture the defendant had on oil lease and well, from which it was pumping oil. Through this pasture there was a draw. Following rains or snows, there was more or less water flowing down this natural watercourse. It was referred to by some of plaintiff's witnesses as a creek, but it could hardly be called that. However, the defendant had a dam above where it collected enough water to form a fresh water pond or lake, which was the water supply for its operations, and which was open as a watering place for stock. It would seem also that, if there was enough, as there was at times, the excess went over the dam and down the draw, leaving small puddles and pools in depressions or holes.

The oil was pumped into a separation tank from which the oil was piped to a storage tank and the salt water piped by quite a long pipe to an earthen storage pond. The pumps, separation, and storage tanks, and the earthen storage pond for salt water (about three acres), were all inclosed by a wire fence.

In the month of August, 1929, the plaintiff noticed a change in some of his cattle; 2 bulls, 38 cows, and 30 calves were affected; they drew up, hair looked thin and dead; they had a fever, would urinate frequently, mouths and nostrils were red, dry, and cracked, they drank water more often, appeared anemic, did not eat well, calves would not follow their mothers, some of them wobbled and staggered in their hindquarters, and they scoured.

The plaintiff and his hired men found about 75 cattle in the inclosure during the latter part of August; they were milling around, some drinking from the salt water pond and from puddles of salt water around the ponds, lines, and tanks; they put the cattle out and repaired the fence. Defendant objected to this testimony on the ground that it was not within the issues made by the pleadings. The trial judge mentioned this testimony in his instructions, but gave no special instruction thereon. Defendant made no objection to the instructions on this point.

It seems that some of the cattle died about the 1st of September; that is, the 4 calves and 2 cows mentioned in the petition. After the petition was filed (November), others died, 14 cows and 12 calves in all. There was evidence that 15 of the 38 cows slipped their calves.

There was testimony that up into July plaintiff's cattle were fat, sleek, and in good condition, worth as follows: The bulls, $250

each; cows, $85 each; calves, $50 each. Plaintiff sold one bull after it was sick for $70. There was testimony that the other affected animals were worth about as follows: the bulls $60 to $80; the calves $15 to $20; the cows $3\frac{1}{2}$ cents to 4 cents a pound, they weighed 700 or 800 pounds. It was said they were valuable only as "canners."

It was said that the plaintiff and others looked around the pasture for other sources of salt water, and found that salt water stood in holes in the creek bed. It was said that some ran down from a hole in the salt water pipe near the separation tank. Apparently other holes were filled with seepage, although the ground was quite dry between the salt water pond and the creek bed.

About the time that plaintiff was having the trouble with his cattle, the defendant at plaintiff's request fenced the largest hole in the draw to keep the cattle out. It was several hundred feet from the salt water pond, and was variously estimated to hold from five to twenty barrels of water. A chemist testified that the water from the holes in the pasture was not fit for the cattle to drink; that, roughly, it contained 3 per cent. salt. It was variously estimated that a toxic dose of salt was 4, 5, or more pounds. By calculation the defendant attempts to show that a large number of plaintiff's cattle could not become poisoned from this hole, because there would not be enough salt in a 3 per cent. solution of the size testified to go around. However, it is conceded that defendant's salt water pond did not overflow because the salt water escaped through evaporation and seepage. Furthermore, the season had been very dry, and this salt water hole must have been caused and maintained by seepage or it would not have been there. If it was caused by seepage, it was probably refilled and maintained by seepage. Also there was testimony that there were other holes, although they must have been relatively unimportant.

There was testimony that it was evident from the ground that there had been salt water flowing over it.

There was testimony of a couple of witnesses who were not experts but were cattle men that the cattle were suffering from salt water poisoning or showed all the symptoms.

The plaintiff moved his cattle out of this pasture on the 20th of September, but they continued sick up into November. As already stated, quite a few died after their removal.

The plaintiff offered Dr. Pedrick to prove that the cattle had salt water poisoning, but he evidently surprised everybody by saying he could not make up his mind as to what was the matter with them. He testified as to their symptoms and the examination made with defendant's witnesses, Drs. Walters and Kinsley. The plaintiff attempted to impeach his witness by testifying that Dr. Pedrick said the cattle had salt water poisoning.

Great emphasis is placed upon the testimony of Dr. Kinsley by the defendant. Dr. Kinsley, an expert in the field of cattle diseases, testified for the defendant. He came down to plaintiff's place in October, and met with some of the parties, including Dr. Pedrick (plaintiff's expert) and Dr. Walters (defendant's expert). They rounded up the sick cattle and agreed upon a typical specimen. The defendant bought the animal from the plaintiff. The experts destroyed it and made a post mortem examination. Dr. Kinsley said they found no evidence of salt water poisoning, but did find that the animal was highly infested with parasites; and it was his opinion that, from that post mortem examination of the one animal and the symptoms of the others, coupled with the fact that the animals had not had access to salt water since September, and so should have shown a greater improvement if they had been poisoned, the cattle were suffering from parasites and nothing else. There is one significant point in his testimony. The normal temperature of a cow is 101 degrees. It seems that a cow suffering from salt water poisoning has a fever (and there was plenty of evidence that the cows here did have a fever), while a cow suffering from parasites has a subnormal temperature. The cow upon which Dr. Kinsley performed the post mortem had a temperature of 103 degrees, which he said was due to the rounding up of the animals.

The court instructed the jury that before they could find for the plaintiff, they would have to find that defendant allowed the salt water to escape and flow over the surface of the land where plaintiff's cattle were ranging, that the cattle drank of the water in sufficient quantities as to cause their injury, and that the proximate cause of their ailment was the drinking of the salt water, which resulted in salt water poisoning. I think the jury had sufficient evidence, if believed, as it evidently was, to find the issues in favor of the plaintiff.

It is argued that Dr. Kinsley was the only one qualified to testify as to what was the matter with the cattle. All the symptoms

shown by plaintiff's cattle were symptoms of, or consistent with, salt water poisoning. Plaintiff's cattle were apparently all suffering with a fever and pronounced diarrhea. The experts seemed to agree that fever was not usual with parasites; in fact, the temperature should be subnormal. Their observation had been that scours or diarrhea sometimes accompanied parasites, but it was not often so severe. It seems to me that the condition of plaintiff's cattle pointed strongly to salt water poisoning; and, when that fact, together with the testimony of the cattlemen and the fact that the cattle had come in contact with salt water, is considered, I think there is support for the jury's verdict. I think that facts were proven which enabled the jury to reach an intelligent conclusion, and they were not bound to follow the testimony of Dr. Kinsley.

The court's instructions are correct, if there was a violation by defendant of a statutory duty imposed by a valid law.

We therefore conclude that there was sufficient evidence to warrant submitting the case to the jury; that the amount of the verdict was not excessive; that there was no error in the trial; and that the judgment should be affirmed.