## MILLER et al. v. NORTON et al.

### (132 N. W. 1080.)

**Removal of county seat — finality of decision of county commissioners.**

   1. *Held*, following State ex rel. Little v. Langlie, 5 N. D. 595, 32 L.R.A. 723, 67 N. W. 958, involving county-seat removal from Caledonia to Hillsboro, Traill county, that the decision of the board of county commissioners on the sufficiency of the petition for removal is final, in the absence of a showing of fraud sufficient to vitiate such petition, and that in this case the board did not lose jurisdiction to make a valid order submitting the county-seat removal question to an election.

**Removal of county seat — immediate action on petition for removal.**

   2. No sufficient reason for deferring action by said board in ordering an election on said petition was made to appear, and its immediate action on such petition was not an abuse of discretion under the facts in this case.

**Removal of county seat — construction of statute providing for.**

   3. Our county-seat removal statute construed, and *held:*

   (a) That it is a departure from relocation statutes in force in this state prior to 1895.

   (b) That the ballot requirements are mandatory, and the entire enactment, when construed therewith, necessitates its construction as a removal statute.

   (c) That the procedure on county-seat removal contemplates a petition

asking removal from the established to a proposed county seat, designated in such petition, to be followed by an election in which the question submitted is in accord with the petition on a ballot containing only the old and proposed new locations as the places from which the voter must select.

(d) That such a construction does not render our statute unconstitutional.

**Removal as distinguished from relocation of county seat.**

4. Removal as distinguished from relocation statutes as to county-seat legislation, and the various county-seat statutes in force in Dakota territory and since statehood, are discussed so far as they relate to uor present statute on this subject.

**Removal of county seat —petition for prohibition against.**

5. Petition for writ of prohibition denied, and application dismissed, and the county-seat removal election accordingly declared valid.

Opinion filed July 20, 1911.  On rehearing October 31, 1911.

Appeal from District Court, Pembina county; *Pollock,* Special Judge.

Petition by M. H. Miller and others.  From an order denying the petition and dismissing the application, the petitioners appeal.

Affirmed.

*H. B. Spiller, E. W. Conmy,* and *Ball, Watson, Young, & Lawrence,* for appellants.

*George A. Bangs, Geo. R. Robbins, D. J. Laxdal,* and *Wm. McMurchie,* for respondents.

Goss, J.  This is an appeal from an order of the district court of Pembina county, denying the petition of the appellants, residents, electors, and taxpayers of the city of Pembina, for a writ of prohibition, and dismissing such application.

At the general election of 1910, there was submitted to the voters of Pembina county the question of county-seat removal ordered July 13, 1910, on a petition for removal from Pembina city to the city of Cavalier.  Further facts are recited in the opinion in connection with the points raised.  To avoid repetition, they are omitted in this introductory statement.

Appellants urge that the county commissioners acted without and in excess of their jurisdiction when they ordered an election without according to the petitioners and other electors of Pembina county, an

opportunity to examine the petition, time to investigate its sufficiency, and, if they should desire the same, further opportunity for hearing as to the validity of the petition for removal. Counsel for appellant appeared before the board of county commissioners for Pembina county in behalf of Pembina city, and hearing was granted him, whereupon an adjournment was taken until the middle of the afternoon, at which time said counsel again appeared, and asked permission to file written objections against final action being taken upon the petition without a reasonable time allowed appellants herein to investigate its sufficiency. The board thereupon proceeded to examine into the sufficiency and legality of the petition, and continued so doing for the remainder of the afternoon and during an evening session. Just prior to adjourning for the evening, said counsel appeared before the board, and filed his written objections to action being taken upon the petition. These objections consisted in a written statement, unverified, made by counsel on behalf of petitioners and appellants in this case, reciting on information and belief that the petition presented was invalid and insufficient under law and fact to serve as a basis for ordering an election, "in that the petition did not conform to the statute; that large numbers of names on said petition were not signed personally by the alleged electors; that a large number were not verified by the electors; that a large number of persons signing said petition were not qualified electors;" reciting, further, that all the objections, except as to the conclusion of law from the form of the petition, were made entirely upon information and belief. The written objections recited that the persons objecting had no knowledge of the contents of the petition prior to its filing at 2 o'clock that day with the county auditor, and "have no knowledge of its contents from an actual examination;" and that said petition was a bulky document purporting to contain 1,800 or 1,900 names, to "investigate regarding which would necessarily require two or three weeks' time in order that the parties objecting be able to inform themselves upon the questions essential to the validity of the petition," concluding with the request that the board defer action to a time fixed; that a hearing be then had on the sufficiency and legality of the petition, at which hearing the persons objecting might bring before the board competent evidence touching the questions affecting the validity of the petition.

The board refused to defer proceedings as requested on the petition, but, instead, having spent the afternoon and evening in such an examination, immediately passed its resolution, reciting the filing of the petition and its contents, and its verification by each of the signers thereof, stating each signer to be a resident of the county of Pembina, and qualified elector therein, and that each signer personally signed his name to the petition, knowing the contents and purposes thereof, finding the same to be facts, and that the petition was so signed and properly verified by qualified electors of said county, equal in number to at least two thirds of all the votes cast in said county at the election held November 3, 1908, being the last preceding general election. The board, by appropriate and specific resolution, thereupon ordered that the prayer of the petition be fully and completely granted, and that the question of the removal of the county seat of the county of Pembina from the city of Pembina, the place where it is now located by law, to the city of Cavalier in said county, be submitted to the electors of said county of Pembina at the election to be held November 8, 1910, at the same time and place as, and in connection with, and as a part of, the general election to be held on said day in said county.

The defendants and respondents herein are the county commissioners and county auditor of Pembina county; and on return to the writ in the district court they made answer and return, reciting the foregoing matters and the findings and order of the board of county commissioners of said county. They made further return that the county commissioners who passed upon the sufficiency of said petition had all of them been residents for more than ten years, and two of them for twenty and twenty-five years, respectively, of said county; that they were intimately and thoroughly acquainted with the electors of the county, and their joint knowledge thereof was such that some member of the board was able to vouch from personal knowledge as to the signature of many of the petitioners, and the qualifications of many, if not all, the petitioners; that a public examination was had, proceeding, without interruption, from 3:30 o'clock in the afternoon of July 13, 1910, to between the hours of 10 and 11 of said evening, except a short intermission had; that in such examination the names of the signers were read aloud by some member of the board, and the genuineness of each signature determined, and the qualifications of the elector so signing

passed upon by the board; that there were present many persons, among them some of the notaries public who had taken the affidavits of the signers verifying the petition; and such notaries, together with other persons present, when requested, furnished information touching the identification of the signatures and bearing on the qualifications of the petitioners; that full hearing was had and opportunity afforded to anyone who might so desire, to inspect the petition, and object to any name or signature, and to give his reason therefor; that the board acted "in everything done in the utmost good faith and with the honest intent and purpose of complying and fulfiling the intent of the law;" that the board thereupon became satisfied of the legality of the petition, the genuineness of the signatures, and the qualification of the signers, and without any desire to act arbitrarily or unreasonably in said matter, but with the intent to avoid the provoking of any feeling or controversy so far as possible to avoid, and, believing that the matter should be promptly disposed of and that nothing could be gained by delay, made its findings as to the legality of the petition, the genuineness of the signatures, and the qualification of such signers, and its order that the matter be submitted to the electors of the county for determination at the general election in November following.

The return further shows that at the election had November 8, 1910, 2,269 votes were cast in favor of the removal of the county seat to the city of Cavalier, and 815 votes cast against the same, such votes being cast by duly qualified electors of said county at said election, a total of 3,084 votes cast, there being 213 votes cast for such removal, more than two thirds of the number of the voters voting at such election, all as shown by the election returns duly certified by the official board of canvassers of said county. Respondents admit that, unless they are restrained, county-seat removal will be had pursuant to said election. The foregoing recites the substance of the return to the writ issued in the lower court in this action.

Counsel for appellant cites Crews v. Coffman, 36 Neb. 824, 55 N. W. 265, as authority for his contention that the board of county commissioners on July 13, 1910, lost jurisdiction to make a valid order of submission to election, because of their alleged arbitrary and unreasonable action in refusing to fix a date for hearing and granting time for investigation before so acting on the petition. The case relied upon fol-

lows a line of decisions from Nebraska, all of which we have carefully examined. Conceding, without deciding, that the action of the board of county commissioners in acting on such a petition involved judicial determination, rather than the performance of ministerial duties, while recognizing that reputable courts are divided upon this proposition (see Territory ex rel. Ridings v. Neville, 10 Okla. 79, 60 Pac. 790, and Baker v. Louisa County, 40 Iowa, 226, as cases illustrating such conflict), we cannot agree with counsel on the facts in this case coming within the rule announced by the Nebraska authorities. Ayres v. Moan, 34 Neb. 210, 15 L.R.A. 501, 51 N. W. 830, and Crews v. Coffman, 36 Neb. 824, 55 N. W. 265, leading cases, are decided on entirely different facts from those before us. In the former (as will be found on page 215 of 34 Nebraska), charges of fraud and bribery were made and charged in a positive affidavit filed before the commissioners, specifically designating the number and names of the persons whose names were illegally on the petition, and charging many other irregularities and illegalities in positive terms as specific and certain as an ordinary pleading in court, and which controverted facts stated in the petition, by actual facts alleged under oath and established that, if the facts recited in the affidavit be true, the requisite proportion of voters required to present a valid petition was not signed thereto. In Crews v. Coffman the affidavit filed before the board requesting a hearing shows a denial of the privilege of inspection and examination of petition; also, that "it is apparent that a large list of the names signed to said petition are fraudulent and forged." The court opinion shows "there is no contradiction of this in the record, so that it will be regarded as true." The objectors in that case filed with the county board an answer in which they alleged that "said pretended petition is not signed by the requisite number of qualified resident voters of Hitchcock county, Nebraska, to authorize the calling of said election. 3. That a large number, to wit, 111 of said pretended petitioners, are minors, persons under the age of twenty-one years. 4. Because a large number, to wit, 385 of said pretended petitioners, are and were nonresidents of the county of Hitchcock, state of Nebraska. 5. Because a large number of said pretended petitioners, to wit, 600, were procured to sign said pretended petition by being misled, and on account of facts having been misrepresented to them, and by unlawful and undue influences. 6. Because

351 of said petitioners were induced to sign said pretended petition by bribery in this, to wit, that the residents and property holders of Trenton represented that they would build a courthouse free of expense to the petitioners of the county. 7. Because a large number, to wit, 350, of said petitioners desire to withdraw their names from said pretended petition. These remonstrators allege that a large number of said pretended petitioners, to wit, 356, are fictitious names, and that no such persons reside, live, or exist in Hitchcock county. 11. These remonstrators further allege that a large number of said pretended petitioners, to wit, 178, are foreigners who have never become citizens of the United States, nor have they declared their intention to become citizens as by law required. 12. That a large number, to wit, 130, of said names that appear upon said petition were not signed by the persons themselves, nor were they signed to said pretended petition with their knowledge or consent, and were forged thereto."

The above extracts from the opinions in these two cases are sufficient to illustrate that the law cited under such a state of facts has no application in the instant case. The extracts quoted show conditions which, if established, must render the petition void. This is charged on actual knowledge specifically and definitely, and a hearing is asked thereon. Compare with the case on trial. Counsel's principal reasons for deferring action, when summed up, amount to a statement that he desires two or three weeks' time in which to investigate into the genuineness of the signatures and the legality of the petition. Not a single fact is alleged from which it can be assumed that the petition is invalid. On the contrary, the written objections carefully avoid stating any facts except on information and belief. It is true it contains a blanket charge that "large numbers of names on the petition were not signed personally by the alleged petitioners, that a large number were not verified, and that a large number of persons signing said petition were not qualified electors," but carefully avers, also, that "said objections are made entirely upon information and belief." No facts are alleged as a foundation for such conclusions on information and belief. In its last analysis the written objection is a nullity. It brought no fact to the attention of the county commissioners. It cast upon them no duty other than existed before its filing. They were in session to determine, in the performance of their duty, the genuineness of the signatures, the sufficiency of verification, and the number of

petitioners. From various sources, apparently acting in good faith, with no undue haste under the circumstances, they determined for themselves such matters of fact. They were not obliged, in the absence of some good reason therefor, to adjourn at the request of an elector or his attorney that such party might satisfy himself privately and in his own way on the same matters that the county commissioners as a board in the performance of their duty were then determining. We know of no rule of law requiring the delay of public business at the behest of a private individual concerning matters in which he may have at most only the same interest as the general public. Under a decision of our own supreme court in State ex rel. Little v. Langlie, 5 N. D. 594, 32 L.R.A. 723, 67 N. W. 958, under § 565 of the Compiled Laws of 1887, the attack on the petition for removal comes too late when made after the necessary two thirds of the electors of the county have at the election determined in favor of county seat removal, thereby approving of the petition and verifying the necessity for election, of which the petition when sufficient is the first official proof when presented to the board authorized to act thereon. The opinion contains the following: "We do not think that, after an election has been held and a sufficient vote has been cast in favor of a place to work a change of the county seat to such place, the question whether the petition had upon it the requisite number of names is open to judicial investigation. While a sufficient petition is undoubtedly necessary, yet the question lies deeper than that. What body is to settle this matter finally? . . . The board is to receive the petition, is to pass upon its sufficiency, and is to order the election if satisfied that it is sufficient. Here is a clear submission of this question of fact to the board for adjudication. The statute contemplates that the board is to settle it one way or the other. No other body is given jurisdiction over the matter. . . . We think such a question may be safely left to the final decision of the county commissioners of a county." See also Hipp v. Charlevoix County, 62 Mich. 456, 29 N. W. 77, and Territory ex rel. Ridings v. Neville, 10 Okla. 79, 60 Pac. 790, to the same effect; and compare with Shaw v. Circuit Ct. — S. D. —, 129 N. W. 907. This was the unanimous opinion of our first court in an action testing the legality of the change of the county seat of Traill county from Caledonia to Hillsboro. We might observe that the Compiled Laws omitted from the petition as essentials now required,

the verification thereof by each of the signers and his statement therein that he "signed his name thereto knowing the contents and purpose of the petition, and that he is a resident of the county and a qualified elector therein." No such requirement was necessary under the law prior to the 1895 Codes, so the Traill County Case was decided under a different petition than now required. But if the action of the board of county commissioners, unchallenged before election was final thereafter, under the loose requirement of the Compiled Laws, in such particulars, it is certainly authority for so holding under a statute prescribing with greater particularity the special proof of way of affidavit of the elector himself, tending to make the petition more certain and more free from fraud, and giving the board of county commissioners more aid and consequently that much less discretion in determining these matters upon which the validity of the petition depends. In this case the sufficiency of the petition stands unchallenged and unquestioned. Appellants, in the proceedings had before the county commissioners, made no charge sufficient to question its validity. From July 13 to November 8, prior to election, the findings of the board were not attacked. Nor does appellant in this action question the sufficiency of the petition, or the verity of the findings of the board, as to the proportion of electors of that county who signed and verified the same. It is possible that instances might arise wherein this court should hestitate to follow the rule announced in State ex rel. Little v. Langlie, 5 N. D. 594, 32 L.R.A. 723, 67 N. W. 958. But in the absence of any charge of invalidity of the petition, under the facts in this case, we hold the decision of the board on these matters to be final.

The proceedings had for removal of the county seat from Pembina to Cavalier were based upon the provisions of the Revised Codes of 1905, included within §§ 2358 and 2363, inclusive. As the whole statute as one act is under consideration, we will recite the same, as follows:

"Sec. 2358. County seat, removal of.——Whenever the inhabitants of any county in this state desire to remove the county seat of the county from the place where it is fixed by law or otherwise to another place, they may present a petition to the board of county commissioners of their county, praying such removal and that an election be held to determine whether or not such removal shall be made. Such petition must be verified by the affidavit of each of the signers thereof, stating that he

is a resident of the county, a qualified elector therein, and that he personally signed his name thereto knowing the contents and purposes of the petition. . . .

"Sec. 2359. Commissioners to submit question to vote; when.—If the petition is signed by qualified electors of the county equal in number to at least three fifths of all the votes cast in the county at the last preceding general election, the board must at the next general election submit the question of removal to the electors of the county.

"Sec. 2360. Notice of election.—Notice of such election clearly stating its object must be given, and the election must be held and conducted, and the returns made, in all respects in the manner prescribed by law in regard to the submitting of questions to the electors of a locality under the general election law.

"Sec. 2361. Ballot, how marked; notice of result.—In voting of the question, each elector must vote for the place in the county which he prefers, by placing opposite the name of the place the mark X. When the returns have been received and compared and the result ascertained by the board, if two thirds or more of all the legal votes cast by those voting on the proposition are in favor of any particular place, the board must give notice of the result by posting notices thereof in all the election precincts in the county, and by publishing a like notice in a newspaper published in the county at least once a week for four weeks.

"Sec. 2362. County seat; when deemed changed.—In the notice provided for in the last section, the place selected to be the county seat of the county must be so declared from a day specified in the notice, not more than ninety days after the election. After the day thus named in the notice the place chosen shall be the county seat of the county.

"Sec. 2363. Statement of result of election; where filed.—Whenever any election has been held as provided in this article, the statement made by the board of county commissioners showing the result thereof must be deposited in the office of the county auditor, and whenever the board gives the notice prescribed in the last section it must transmit a certified copy thereof to the secretary of state.

"Sec. 2364. Election held only once every four years.—When an election has been held and at least two thirds of the votes cast at such election are not cast for some other place than that fixed by law as the

former county seat, no second election for the removal thereof must be held within four years thereafter." (Amended by Sess. Laws, 1907, chap. 61, to ten years.)

Following these provisions are those relative to a second removal after one removal has been had, in which the statutory provisions as to voting and marking of ballot with notice and record of result are similar to those required in original removals. We are concerned with the application and interpretation of the statute under its provisions applying to first removals.

The petition prayed for removal of county seat from Pembina, where it was fixed by law, to another place designated, the city of Cavalier in said county. The petition otherwise contained the requisite averments, and was subscribed and verified by the affidavit of electors equal in number to more than three fifths of the votes cast in the county at the last preceding election prior to the date of said petition. Thereupon the county commissioners ordered the question submitted. The ballot used in the election was in the following form:

## County-Seat Removal.

Shall the place of the county seat of Pembina county be removed from the city of Pembina, where it is now located by law, to the city of Cavalier?

The voter will indicate his choice by placing an (X) after the name of the place which he prefers below;

For the City of Cavalier for County Seat     ☐
For the City of Pembina for County Seat     ☐
by making a cross (X) opposite the city you wish to vote **for.**

The foregoing was the form of the ballot as the same was printed upon a lengthy sheet also containing thereon two proposed constitutional amendments submitted to the vote of the people; and also the question of county aid of a county fair, likewise submitted to a vote, the county-seat removal matter being printed between the constitutional amendments and the tax proposition with the direction as to the cross (X) at the end of the ballot. No question is raised as to any prejudice resulting on the county-seat removal from the manner of the placing of the

same on the ballot, and considering the number of votes cast, 2,249 for removal and 815 against removal, a total of 3,064, on the question of removal of county seat, it is clear that few, if any, voters in the county failed to vote upon the question, notwithstanding the manner of its submission.

Counsel for the appellant Pembina city bases his case on the premise that the petition is restrictive and void, in that it confines the petitioner to the place named therein, contending that the petition should contain but the words of the statute, petitioning the removal from Pembina city, "where now fixed, to another place," the place being unnamed: That likewise the ballot submitting the question of removal to the electors should not have restricted them to a choice between cities of Pembina and Cavalier, thereby preventing the voters from expressing their free choice in the matter of relocation. But that the voters should be free to both designate and vote for the place they prefer for a county seat. Our statute is apparently ambiguous, in that it may be construed as: (1) Authorizing a petition for removal of county seat with place unnamed, followed by an election with an open vote in which any place or location in the county may by the voter be nominated and voted for, with the requirement that the particular place chosen shall have two thirds of all votes cast at the election, otherwise the county seat location to remain unchanged; or (2) it may be interpreted to require that the petition for removal shall be to another place designated therein, to be followed by an election in which the question submitted thereby shall be that of whether a change shall be had from the old location to the one petitioned for, with no other proposed county-seat candidates in the field and no other question presented by the ballot, and followed by removal to the place petitioned for if two thirds of all votes cast in the election be in favor of such removal. In the interpretation of an ambiguous statute to aid in its construction, resort may be had to the history of similar previous legislation, with which the legislature is presumed to have had knowledge. Likewise consideration may be given the source from whence the statute was obtained, if traceable, including departures in the borrowed enactment from the original. The legislative intent is also important as apparent from the entire enactment considered with the subject of the legislator

·and the object to be accomplished. In addition to the general intent
.and object to be attained, should be kept in mind the mandatory portions
·that must have been intended as modifying other parts thereof. All
these may be found to be aids in determining the construction to be
placed on this ambiguous statute, the construction of which involves
:so important a matter as that of determining the location of a county
:seat in which the inhabitants of an entire county are deeply concerned.
A brief review of general county-seat legislation of this state and Da-
:kota territory is in order.

The right of Dakota territorial assembly to legislate on county-seat
matters was granted by U. S. Rev. Stat. § 1851, in the organic law
·common to all territories, providing in general terms: "The legislative
power of every territory shall extend to all subjects of legislation not
:inconsistent with the Constitution and laws of the United States." This
:remained unchanged by the enabling act, and the enactments of the terri-
:torial assemblies on county-seat matters continued in force as they ex-
:isted at statehood.

The first statute on the subject was enacted by the first legislative as-
:sembly of the territory of Dakota, in 1862, as chapter 20, Laws Dak.
:1862, reading:

"Sec. 1. That when any number of the legal voters in any county
:in this territory, equal to one half the highest number of votes cast the
:last preceding general election in such county, shall, at least thirty
·days previous to the next ensuing election, petition the county commis-
:sioners of such county to be allowed to vote on the removal or location of
the county seat of such county *to any point within such county,* the said
·commissioners' shall cause to be inserted in the notices for the next gen-
·eral election an article requiring the voters of such county to vote on
the removal of the county seat to, or the location thereof, at the point
named in the petition. That only *one point of removal or location shall
.be voted for* in each year and that point shall be the one presenting the
largest number of petitions; provided that the same point was not voted
for at the last preceding election, and that it shall be lawful for such
petitioners to deposit any sum of money or bonds with the county treas-
·urer which they may propose to donate for the erection of public build-
ings at the point petitioned for: Provided that in any of the counties
·of the territory in which the county seat has been or shall hereafter be

located by a vote of the electors of said county, the place at which the county seat is so located shall be and remain the county seat at least three years after the time of taking such vote; and no new vote shall be had on the relocation of the county seat until the expiration of said three years.

"Sec. 2. The voters of any county so qualified shall vote at the next general election on the removal or location of their county seat, by ballot written or printed, as follows: For county seat at ........ (filling the blank with the place named in the petition) or, against county seat at ........ (filling the blank as above), and if a majority of the votes cast are for *the point named in the petition* then that place shall be the county seat, otherwise the county seat shall remain as before."

From the foregoing it is noticeable that the petition for removal contained the name of the proposed county seat, and that the ballot was restrictive in requiring a choice between the old and the proposed new county seat, and not permitting an open vote on the question. The statute was a removal as distinguished from a relocation statute, the difference between which will be more definitely pointed out hereinafter. This statute remained in effect five years until the act of 1867 (chapter 13, Laws Dak. 1866–67), consisting in part of the following provisions:

"Sec. 1. That when any number of the legal voters in any county of this territory, equal to one half the legal number of voters as shown by the census of the last preceding assessment in such county, shall, at least thirty days previous to the next ensuing election, petition the county commissioners of such county to be allowed to vote on the removal or location of the county seat of such county, the said county commissioners shall cause to be inserted in the notices for the next annual election an article requiring the voters of such county to vote on the removal or location of the county seat of such county at the next ensuing election.

"Sec. 2. The voters of any county so qualified shall vote at the next election on the location or removal of their county seat, by ballot written or printed, as follows: For county seat at ........ (filling the blank with the name of the place voted for), and if the vote be for the removal of the county seat which has been previously located by direct act of the legislature, or by vote of the people, it shall require a majority vote to remove any county seat thus located. But if the vote be for the location of a county seat in any new county which has been temporarily designated by special act, a simple plurality vote shall be deemed suffi-

22 N. D.—14.

cient for the removal or location of the county seat of such new county at the first election therein; but thereafter the county seat of such county shall not be removed except by a majority vote of the people, equal to one sixth of the total vote cast at the last annual election in such county."

This statute was clearly what is known as a relocation as distinguished from a removal statute; that an open vote was permitted; the electors were not restricted in their choice to any particular place, but, instead, could write the name of their choice for county seat on the ballot; and that a majority or "simple plurality vote," as termed, governed, whether its effect be to remove the county seat from the place previously chosen or to select a county seat in lieu of a temporary choice therefor previously named.   In accordance as we may presume conditions required in a new and sparsely settled country just beginning to be organized into counties, the territorial assembly changed from a removal to a relocation statute.   The next legislation on the subject is found in chapter 4 of the Laws of Dakota of 1868–69, particularly at §§ 46, 47, and 48 thereof, as follows: · "Sec. 46.   Whenever any county shall organize in this territory, the qualified voters thereof are hereby empowered to select the place of their county seat by a vote at the first election held in the county for the choice of their county officers.   For this purpose each voter may *designate on his ballot the place of his choice* for the county seat, and when the votes are canvassed the place having the majority of all the votes polled shall be the county seat, and public notice of such location shall be given within thirty days by the tribunal transacting county business, by posting up notices in three several places in each precinct in the county."   This provision applied only to counties . organizing to enable the selection of a county seat by ballot simultaneous with the first election of county officers.   The location feature as applied to county-seat matters remains here as in the next provisions, *viz :* "Sec. 47.   Whenever the inhabitants of *any county* are desirous of changing the place of their county seat, and upon the petitions being presented to the tribunal transacting county business, signed by two thirds of the qualified voters of the county, it shall be the duty of said tribunal, in the notices for the next general election, to notify said voters to designate upon their ballots at said election the place of their choice, and if upon canvassing the votes so cast it shall appear that any

place has two thirds of the votes polled, such place shall be the county seat, and notice of such change shall be given as hereinbefore provided in the case of the location of county seats of new counties." Under this section, the elector voted for the place of his choice, but the requirement to select was raised from a majority to two thirds of the votes polled. No place was required to be designated in the petition for relocation. Continuing, § 48 of the general act reads: "If no one place has a majority of all the votes polled, as provided for in § 47, it shall be the duty of the tribunal transacting county business, within one month after said election, to order a special election and give ten days' notice thereof by posting up three notices in each precinct in the county, at which election votes shall be taken by the ballot between the three highest places voted for at the first election. And if no choice is made at such election, notice of another election shall be given, as above provided for, to decide between the two highest places voted for at the last election, and the place having the highest number of votes shall be the county seat." The statute remains primarily a *relocation* statute, in which the voter chooses between places, an open field for choice in which he may vote for any place in the county at the first election, and thereafter as a removal statute vote for a choice between the "highest places" in subsequent elections until the site is fixed by, perhaps, a majority between two places.

The next important legislation touching location of county seats is in chapter 27 of the Laws of Dakota Territory of 1874–75, re-enacting §§ 46, 47, and 48 of the Laws of 1868–69 as §§ 41, 42, and 43 of the Laws of 1874–75. The assembly had in 1871 by chapter 12 of the Laws of 1870–71 granted the county commissioners the power to temporarily locate county seats in newly organized counties. In the codification of territorial laws, compiled by authority of the territorial assembly, we find on page 32 of the Laws of Dakota of 1877, under the head of "Location of County Seats," §§ 41 and 42 of the Laws of 1874–75 re-enacted, § 43 thereof being omitted and being expressly repealed by the general repealing act in the Revised Codes of Dakota of 1877, by the repeal of the chapter in which it was contained. And by this repeal a provision for second and third elections, after a first election on the matter of determining location of county seats, passed from the statutes of our state. This remained until amended by chapter 173 of Laws of Dakota Territory of 1887, providing for *relocation* of county seats

where previously located by a majority of less than all the electors voting thereon, the same being accomplished by a petition presented to the judge of the district court or to the chief justice of the territory, signed by at least one third of the electors of the county as shown by the vote cast at the last general election, which petition prayed for an election, and upon which the judge to whom the same was presented acted by ordering a special election to determine "the question of the *relocation* of the county seat of such counties." In the ballot the voter wrote the name of the city or town for which he desired to cast his vote for county seat, and the place thus receiving more than a majority of all votes cast at the election became the county seat; and, in case of no one place receiving a majority of all votes cast at the election, "the question of a relocation of the county seat" was again to be submitted at the annual election in 1887, as between the two places having received the highest number of votes at the preceding special election, and the one receiving the highest number of votes at such general election became thereby the county seat.

Next we find in the Compiled Laws of 1887, § 565, thereof: "Whenever the inhabitants of any county are desirous of changing the place of their county seat, and upon petitions being presented to the county commissioners, signed by two thirds of the qualified voters of the county, it shall be the duty of the said board, in the notices for the next general election, to notify said voters to *designate upon their ballots,* at said election, *the place of their choice;* and if, upon canvassing the votes so given, it shall appear that any one place has two thirds of the votes polled, such place shall be the county seat; and notice of such change shall be given as hereinbefore provided in the case of the location of county seats of new counties." It will be noticed that § 565, Comp. Laws, is § 47 of chapter 4 of the Laws of 1868-69,—the second relocation statute passed in Dakota territory. Thus a relocation law remained in force from 1869 to 1895, when an entirely new statute, the present statute, was enacted with the adoption of the 1895 Code. Just prior to the enactment of our Codes in 1895, Montana had passed a county-seat removal statute entirely different from the existing county-seat removal law in force in this state, and we find the Montana statutes, with but one line omitted, taken bodily and inserted into the Codes of 1895, in lieu of § 565, Comp. Laws 1887. The complete change in the statute generally from

that existing prior to 1895 is strongly indicative of legislative intent to depart from existing law and procedure. This is strengthened when we find the entire new law was borrowed in all its unusual and peculiar features from a sister state, and the former law supplanted thereby expressly repealed. Our statute is identical with that of Montana, even to the wording, arrangement, procedure, and peculiarity in declaring the result obtained by the election, as will be noted by the comparison of §§ 1880 to 1887, N. D. Codes 1895, with §§ 4157 to 4165, Montana Political Code 1895. We do not hesitate to declare the Montana statute as to county-seat removal to be the origin of our present law on that subject. In interpreting re-enacted statutes, the court will follow the construction which they received when previously in force. To be so construed, it is not necessary that the re-enacted statutes should be in the identical words as it formerly existed, 2 Lewis Sutherland, Stat. Constr. § 403. The same rule applies when a statutory provision is taken from a constitutional provision which has been construed. State, Anderson, Prosecutor, v. Camden, 58 N. J. L. 515, 33 Atl. 846. Likewise a statute adopted from another state, when construed by the courts of that state, is deemed adopted with such statutory construction interpreting it. 2 Lewis's Sutherland, Stat. Const. § 404; Fitzmaurice v. Willis, 20 N. D. 372, 127 N. W. 95; in which case cited the Wisconsin construction of our registration laws adopted from that state were recently followed by this court in a county division election in Ward county. If such force is given a statute adopted as to accept with it the decisions of the foreign state there interpreting it, most assuredly mere minor omissions or changes from the adoption of it literally do not change the intent or meaning or make it other than the statute patterned after (except when an intent that it shall be construed differently plainly appears), especially when the statute as adopted is in entire harmony with the other law of our state on the subject. Among the new features so borrowed are those requiring "a petition," instead of petitions; the submission of the question to the people by an election held and conducted "in all respects in the manner prescribed by law in regard to the submitting of questions to the electors of a locality under *the general election law;*" the requirement that the elector in voting on the question "*must* vote for the place in the county which he prefers *by placing opposite the name of the place the mark* (X) ;" also providing for the same

*declaration* of choice for county seat and *notice* thereof as provided in the Montana statutes; also the peculiar phraseology of § 2364, providing that elections for removal cannot be had more than once in four years (since changed by 1907 statutes to ten years). Identical is it in arrangement with the Montana statute. All these provisions—§§ 2358 to and including § 2364, Revised Codes 1905—were taken literally, excepting two alterations. These changes consisted in the use in § 2361 of the words "or more" and " two thirds," instead of majority, so as to read: "If *two thirds* or *more* of all the legal votes cast by those voting on the proposition are in favor of any particular place, the board must give notice of the result" in the manner prescribed. Singularly the other change from the Montana statutes is in the omission of the words *"place named in the petition"* from § 1880, Revised Codes of 1895 (§ 2358, Revised Codes 1905). The Montana statute reads: "Whenever the inhabitants of any county of this state desire to remove the county seat of the county from the place where it is fixed by law or otherwise, to another place, they may present a petition to the board of county commissioners of their county praying such removal, *such place to be named in the petition,* and that an election be held to determine whether or not such removal must be made." The balance of the section and procedure, except as mentioned, was incorporated from the Montana statute into ours unchanged, including the Montana provision for voting by *"placing opposite the name of the place the mark* (X)." Was it intended, by the omission of the words "such place to be named in the petition," to omit the Montana statutory requirement in such respect? To answer this question, let us consider the vital part of the statute regulative of the ballot. Section 2361, Code 1905 (§ 1883, Code 1895), limits to the exercise of the ballot the manner in which the will of the electorate on the question of change of location of county seat is expressed. Such requirements prescribing the ballot and what shall appear thereon are, under all the authorities, held mandatory. To be a valid election, a ballot in the required form must be used and the election had with an official ballot provided. See Perry v. Hackney, 11 N. D. 155, 90 N. W. 483; also Miller v. Schallern, 8 N. D. 395, 79 N. W. 865, construing § 524, Codes of 1895, as to official ballot provisions required by §§ 489, 492, and 493, of the Codes of 1895. Section 1882, Codes 1895, provides that these general provisions here

apply in this election matter. These provisions are found at §§ 614 to 640, Codes of 1905. This ballot provision is at least mandatory to the extent that a ballot must be provided substantially meeting the statutory requirements permitting the elector to vote for a place thereon by making a cross after it. 15 Cyc. 354b; Parker v. Orr, 158 Ill. 609, 30 L.R.A. 227, 41 N. E. 1002, 15 Cyc. 345; McCreary, Elections, §§ 693 et seq.; Perry v. Hackney, 11 N. D. 155, 90 N. W. 483, and authorities there cited. And for a county-seat removal case where the requirement as to ballot was held to control over the general provisions as to the petition, see Allen v. Reed, 10 Okla. 105, 60 Pac. 782, 63 Pac. 867. The ballot provision, therefore, being to such extent mandatory, substantial compliance therewith must be had to have a valid election on the matter. Such ballot provisions must be construed with those as to the petition required.

Our statute provides: "The voter must mark opposite the name of the place the mark X," in expressing his preference for county seat. This provision being mandatory, the question then arises how the name of the place is authorized to be upon the ballot prior to the election? From what source does the county auditor know the names of the proposed county-seat locations to be placed upon the ballot? By what is he guided in the performance of the duty required of him by the election laws, in providing the voters of his county with an official ballot required under §§ 614 and 640 of the Codes of 1905, that shall have thereon the names of the proposed candidates for county seat, that the voter may be enabled to vote on such question by placing, as commanded by statute, the cross *opposite the name on the ballot?* There is but one possible answer, but one reasonable source from which to procure the names,—*the petition for change of location, under and because of which the election itself is held.* Bear in mind the petition brings the question before the people, and in so doing defines the question to be submitted to them, as being whether the county seat shall be changed from the place where fixed by law to another place. Unless the statute relating to the contents of the petition in the light of the required ballot be construed to the effect that the petition shall designate the place, that the ballot may be framed accordingly, the statute as to ballot must be ignored in that mandatory part thereof specifically defining the manner of exercise of franchise, the manner of expression of choice, the chief object to be

obtained by the entire statute.    It is certain, then, the statute contemplates that the ballot when presented the voter shall have thereon the names of all places he is able to vote for from which he may make his selection; otherwise why designate that he shall place opposite the name of the place the mark X?    Then, again, why repeal the former statute permitting him to *designate* the name of the place he desires, and, instead, prescribe a voting for such place as will require him to place a mark opposite the name of the place, without specifically empowering him to designate the place?    By repealing the voter's authority for designation formerly existing by statute, his right to designate was thereby legislated against, repealed, denied.    The repeal of a law granting a power is an implied prohibition of the exercise of the power, as plainly so as though in addition to the repeal useless words forbidding the exercise of the power had been enacted.    In lieu of the right of the voter to designate the name of the place on the ballot he votes, the legislature substitutes an enactment providing he "must vote for the place in the county which he prefers, by placing opposite the name of the place the mark X."    Clearly his power to designate the place does not exist, and his right to vote is confined to the placing of his mark opposite some name on the ballot; also, the words defining the elector's choice in voting, providing he must vote for the *place in the county which he prefers,* is limited as is the voter to the places among the names of the candidates on the official ballot, and cannot, to the contrary, bring upon the ballot names of places for accomplishing which there is not procedure outlined, besides being contrary to the plain prohibition by repeal of the statute formerly giving the power.    The source of this language is from relocation statutes adopted indirectly from California. These were modified into removal statutes and so adopted.    The phrase loses necessarily its importance, as it must be regarded as limited by amendment changing entirely the nature of the original statute, of which it was first a part.    Likewise the statutory provisions, "if two thirds or more of all the legal votes cast by those voting on the proposition are in favor of *any particular place* the board must give notice of the result," that inferentially such place shall be the county seat, is to be construed in connection with the ballot provided for the selection of such particular place, and as in nowise affecting the proposition that the name of the place must appear upon the ballot in order that it may be voted

for. With this statutory requirement in mind as a key to the intent, remembering the whole procedure to be but one legislative act to be harmonized and made operative, to be construed as complete rather than incomplete legislation, the legislative intent as well as the object to be accomplished is plain. Such construction irresistibly leads to the conclusion that § 2358, providing for the petition, is to be construed as it existed in Montana beside which there stood the separate ballot provision—§ 4160, Montana Code 1905—with its mandatory requirement as to marking; and we conclude that the words relative to the petition praying such removal, "such place to be named in the petition," were inadvertently omitted with no intent to change the general intent and object of the act borrowed, or, if not omitted inadvertently, then under the reasonable supposition that such words omitted were useless as rendering the statute no more definite than it was without them. If we were construing the Montana law as to provisions for petition and ballot, such would be the only construction to be given. Being satisfied the statute was adopted from Montana, and should be construed as identical therewith, we have no more hesitancy in declaring the construction to be given, than the source from which our statute was obtained. It is a removal as distinguished from a relocation statute.

Counsel for appellant insists on the right to an unrestricted vote, and that the statute be construed as granting the voter the right to vote his preference as to place, and that the ballot in restricting a vote to a choice between Pembina and Cavalier as county seats was void in not permitting free choice in such respects. However, counsel admits the impossibility of determining the manner in which the ballot should be prepared that it may contain thereon the names of many or all of the various places in the county the voters may desire to select from, and still permit the elector to comply with the statute and exercise his choice by "placing opposite the name of the place the mark X." Counsel was previously before this court in this matter in State ex rel. Atty. Gen. v. Norton, 20 N. D. 180, 127 N. W. 717, asking relief by prerogative writ, there also admitting the impossibility of construction to supplement the statute, and determine how any other candidate for county seat than the one named in the petition therefor could be placed upon the ballot. The statute is entirely silent upon this very important question if the petition be construed as appellants desire. But if

·considered as a removal statute, to. the effect that the petition named the place proposed shall be the ground work for the ballot presenting the ·choice of that place or the old county seat to the voters in the election, the statute is complete as to procedure and plain as to intent.   The impossibility of counsel to find legal basis for their desired ballot shows the fallacy of the argument under which it would become necessary to adopt the construction urged and attempted performance of the impossible.   We are forced to adopt the contrary construction of the statute.

An election was had in 1894 under the relocation statutes, in which the county seat of Pembina county was sought to be located elsewhere than at Pembina, and the requisite two thirds necessary to the relocation failed, and Pembina city has remained the county seat.   Counsel for appellants, after calling attention to this, refers to the action of Representatives Restameyer and Johnson in 1907, representing the legislative district in which Cavalier city is situated, in introducing a bill to amend the sections of the statute now under construction, to require the name of the place to be inserted upon the ballot to be that named in the petition for removal of county seat.   Counsel urges that the action of the legislative assembly in failing to pass the proposed amendment in 1907 is in line with appellants' construction of the statute, and contrary to the one adopted in this opinion.   We fail to see any force to counsel's argument, for the reason that the legislature may have adopted our construction of the statute, and so declined to amend, considering it unnecessary to perform an idle act in further explaining a matter already declared in plain English.   Likewise is the discussion in the constitutional convention found on pages 128 to 132 of the Debates of the Constitutional Convention, without significance on this matter, except their action in leaving the matter of change of county seats to legislation, instead of fixing it by constitutional enactment.   Undoubtedly the sense of that convention was in accord with their action.   They may have, and probably did have, in mind the prior legislation on county-seat matters of the Dakota territorial assembly.   If so, they must have known of its earlier adoption of the removal statute and its change thereafter to the relocation system, and declined to bind the state in the future in such important matters by constitutional enactment, leaving this question to future legislation.   The wisdom thereof is shown by the fact that subsequent legislatures have deemed it necessary to amend and entirely

change the then existing procedure, and return to the old removal system as manifestly done in the adoption of the Codes of 1895.

Appellant in his brief urges that to so construe the law would permit petitions for the removal to be used by the established county seat to prevent any county-seat removal whatever by the filing at successive elections of a petition for removal to an undesirable location, thereby putting in the field at each election permitted a weak candidate as a contender against the established county seat; and, inasmuch as a vote on removal cannot be had more often than once in ten years, any removal whatever could be prevented. The fallacy in this argument lies in appellant having overlooked the statutory requirements as to the petition. The statute requires the petition to be signed by qualified electors equal in number to at least three fifths of all the votes cast in the county at the last preceding general election, and that the affidavit of each of the signers thereof shall be attached to the petition, and in such affidavit each petitioner must swear he is a resident of the county, a qualified elector, that he personally signed his name thereto *knowing the contents and purposes of the petition.* One reason for the requirement is to compel the petitioner to know what he is signing and the object to be accomplished. The question of instituting removal proceedings rests with the right of petition knowingly exercised by three fifths of the entire electorate of a county. Counsel assumes the possibility that such a petition could be obtained for an undesirable place, "a weak candidate," thereby preventing a needed removal from the established location. It would be a violent assumption for this court to assume, as has counsel, that three fifths of the voters of a county will knowingly join in petitioning an election to bring about something they do not desire, whether because induced against their will to so petition, or that they may defeat the movement at the polls, and thereby prevent removal. This argument does not appeal to us as persuasive. Conceding it to have some force, it amounts to but the practical operation of the county-seat election we are asked to say was intended, if the same be construed as a continuation of, instead of departure from, the statute regulating county-seat removals in force immediately prior to the going into effect of the 1895 Code. Under counsel's illustration, the petition would be obtained in part that the election procured thereby could be defeated by the petitioners at the election. Under the old relocation system, the open vote in prac-

tical operation accomplished the same purpose, in that a sufficient num-
ber of weak candidates for county seat could be procured to enter the
race as to reduce the total vote sufficiently to prevent the real opponent
of the established county seat from procuring the necessary two thirds
of all the votes cast on the removal question at the polls. In practical
operation to obtain the desired result, the latter was the less difficult.

In discussing the questions involved in this opinion, we have desig-
nated our present statute as a removal as distinguished from a relocation
statute. We have used these terms advisedly. They are not synonymous
when applied to county-seat removal statutes. The terms "removal"
and "relocation," as so applied, signify statutes of radically different
procedure with different characteristics. Under relocation statutes in
election it is the old county seat against the field in which the voter may
designate in writing on the ballot any place in the county as the place of
his choice. He is not restricted in making such choice to places nomi-
nated, but may, instead, nominate and vote his choice. As in voting, so
in petitioning. The people desiring relocation may petition not for any
particular place, but for the relocation of the county seat. The inciden-
tal result may mean a change or removal of the county seat from the
place where formerly located to the place where relocated, but the idea
prevalent throughout the whole procedure from petition to ballot is not
of removal from the established to a proposed county seat, but the ques-
tion *where the county seat shall be located.*

On the contrary, under removal statutes the primary question is one
really of removal. The petition asks it from the county seat to a pro-
posed new county seat designated in the petition. The intent inherent
in a petition for removal is of restricting the voters to a choice between
two places, the old and the proposed locations, instead of the contrary
idea under relocation statutes of an open field with many candidates,
and a free and unrestricted choice. As in the petition under removal
statutes, so in the ballot. The preference of the voter is restricted to a
selection between two locations. Usually the proposed location has ad-
ditional burdens to be met to be successful, compared with the require-
ments for relocation, such as a larger petition and greater percentage of
vote usually necessary to remove than to relocate. The law governing
petitions for relocation and elections thereunder is not therefore strictly
applicable to petitions for election under removal statutes. We have ex-

amined most of the county-seat removal and relocation statutes. As heretofore indicated, our present statute, as we construe it, is the Montana removal statute adopted there in 1895, contained in chapter 2, pt. 4, title 1, Mont. Codes 1895, obtained by Montana probably from the early California relocation statutes, the act of 1850 (Stat. 1850, chap. 80) as amended by act of 1854 (Stat. 1854, chap. 47) of that state, declared unconstitutional in Dickey v. Hurlburt, 5 Cal. 343, because conferring upon the county judge to whom the same was to be presented for the order calling the election other than judicial powers. In this early act we find almost the phraseology of the Montana and our own statutes; it reading: "Whenever the inhabitants of any county of this state desire to remove the seat of justice of the county from the place where it is fixed by law or otherwise, they may present a petition to the county judge, praying such removal, and an election shall be held to determine to which place such removal shall be made." This was re-enacted and stands as the present statute, except the petition is presented to the board of supervisors. Section 3976, Kerr's Political Code of California, and subsequent sections. From the similarity of arrangement, phraseology, subject-matter, and peculiarities found in these statutes of California, identical nearly with our own, we assume that our law adopted from Montana was originally taken from California. It is noticeable that, while § 3976 of the California Codes and subsequent sections are relocation statutes, and much similar to Montana's and our statutes, whereby the voter must vote for the place he desires by placing a cross opposite the name on the ballot, is absent from the California statute, and in its stead is § 3980, also, however, providing and showing the source of the phraseology found in our § 2361, in part: "In voting on the question each elector must vote for the place in the county which he prefers," identical with our statute, but closing with the words, "as the seat of justice, plainly designating it on his ballot." This section (3980), enacted in 1872, evidently is the source from which the forepart of § 2361, N. D. Codes 1905 (N. D. Codes 1895, § 1883), identical with and constituting all of § 4160, Mont. Codes 1895, is taken. Again, we find § 3984, Cal. Codes, enacted in 1872, as amended in 1880, identical with § 4164 Mont. Codes 1895, and § 2364, N. D. Codes 1905 (N. D. Codes, 1895, § 1886), with the exception that the Montana statute substitutes the word "majority" for "two thirds" as

the necessary vote required to remove the county seat. Likewise § 3982 of the California Codes is identical with the California statutes passed in 1872, with § 4162 of the Montana Codes of 1895, and § 2362 of the North Dakota Codes of 1905 (§ 1884 of the Codes of North Dakota of 1895). In many other respects the statutes are nearly exact duplicates. So many earmarks of the place of origin are prevalent that we conclude the California statute has been the pattern from which the Montana statutes, copied in our Codes of 1895, were taken. The Montana legislature changed the California statute by slight alteration into a removal statute, and as such it was adopted here in 1895.

We might remark that the following states whose statutes we have examined are removal and relocation statutes, respectively:

Removal: Minnesota, South Dakota, Michigan, Indiana, West Virginia, Iowa, Wisconsin, Washington, Kansas, Kentucky, Maine, Mississippi, Missouri, Montana, North Dakota, Ohio, and South Carolina.

Relocation: Alabama, Arkansas, California, Colorado, Florida, Nebraska, and Oklahoma.

Appellants contend that a holding of the statute to be a removal statute would necessarily require it to be held unconstitutional as being special legislation relative to county seats, contrary to § 69 of our Constitution, providing: "The legislative assembly shall not pass local or special laws in any of the following enumerated cases, that is to say: (3) Locating or changing county seats." The statute is a general one, applying without reference to any particular locality and prescribing procedure only. If this statute should be held unconstitutional, all general statutes regulating the matters covered in the thirty-five different subdivisions of which locating or changing county seats is but one would likewise be determined void. The constitutional inhibition against special legislation does not prevent classification, when such classification is natural, not arbitrary, and standing upon some reason having regard to the character of the legislation of which it is a feature. Edmonds v. Herbrandson, 2 N. D. 270, 14 L.R.A. 725, 50 N. W. 970. All county-seat removal statutes necessarily fall under one of two general heads. We see no reason, so long as the statute has general application, for holding it unconstitutional. To so hold would be to declare there could be no removal statute, and equivalent to holding any general classification statute along removal lines invalid. Counsel has cited

no authority, and, after considerable investigation, we have been unable to find any, to support his contention. As supporting the contrary, see 11 Cyc. 369; Mode v. Beasley, 143 Ind. 306, 42 N. E. 727.

Counsel for respondents contends that appellant has invoked the wrong remedy in proceeding by writ of prohibition; that appellant should have had review by certiorari. We have held with respondents on the merits, it is unnecessary and needless to pass on this interesting question of procedure. Courts and text-book writers disagree on the propriety of the use of the writ of prohibition under the circumstances in which it is sought to be used in this action. Having disposed of the issues on the merits, there remains no necessity for determination of this question, and we do not pass upon it.

The writ heretofore issued, restraining the county commissioners, respondents, from further proceedings necessary to effect the removal of the county seat from Pembina city to Cavalier in said county of Pembina, as provided by law, is hereby vacated and dismissed; that removal may be had pursuant to said election herein declared to be valid and sufficient.

It is so ordered.

MORGAN, Ch. J., not participating. W. C. CRAWFORD, Judge of the Tenth Judicial District, sat by request.

## On Rehearing.

GOSS, J. A petition for rehearing was granted in this case that everything throwing light upon the decision of an action of such importance should receive consideration. We fully realized that in a matter so vitally and directly affecting thousands of people, as a decision fixing the permanent location of a county seat, too much discussion and too thorough investigation could not be had prior to its final determination; that in this, as well as in all other matters, no decision should be rendered that will not stand the test of reason as well as the closest analysis from every legal standpoint. With this in mind, the petition for rehearing was granted, that the conclusions in the former opinion might be re-examined, and that any additional law on the subject not heretofore considered could be brought to our attention, that there might be no reasonable doubt as to the verity of the final decision and the prece-

dent thereby established. The case has been fully reargued before this court, and full reconsideration given, with all members participating, and the conclusion has been reached unanimously that the conclusions heretofore arrived at in the opinion filed are correct.

On reargument we have had our attention called to the files in the office of secretary of state, wherein is the original bill enacting in 1895 the revision of the Political Code, of which the county-seat provisions under consideration are a part. It is significant that this enrolled bill originally contained the words the omission of which has rendered this statute ambiguous. Said bill, as drafted, was an exact duplication of the Montana county-seat removal statute in such particulars, and contained the requirement that the petition for removal should pray such removal "to the place named in the petition." But through such words, "to the place named in the petition," a line has been drawn with a pen, and the Codes thereafter printed have omitted the words evidently stricken from the original bill either before or after its enrolment.

The report of the revision commission (of which one member of this court was secretary) was reported to the legislature of 1895, on January 10th of that year. The legislature, acting on such report, appointed a joint committee of five from the house and four from the senate, to which joint committee was submitted the report of said revision commission. See pages 45 and 46, House Journal 1895. Seven bills, each bill a code, were then reported and became, with more or less change, the seven codes, the compilation of which, with amendments, constitutes our present Revised Codes. The legislature of 1895 perpetuated the report of this revision commission in the printed report of the legislative joint committee thereon, found in full as the appendix to the house journal of that year. It is significant that in said committee's report on the proposed Political Code (found in said appendix there numbered as § 2010) is found under the designation of "New Legislation" the present 1905 Code provision (§ 1880, Code 1895), but containing, in addition thereto, that the petition pray removal "to the place named in the petition." With this is found all the provisions of our present law, including that as to marking of the ballot as contained in § 2361, Code 1905 (§ 1883, Codes 1895), except that such ballot provision was not when reported by said joint legislative committee coupled in the same section with the provision as to canvass of returns

as it is in the Codes of 1895 and 1905. In other words, the division and numbering of the sections, as well as the requirements, were as so reported and tendered for passage in all particulars, even to sectional division, identical with the Montana legislation on the subject, in which state, as is cited in the main opinion in this case, the ballot provision was numbered as a separate section of statute, standing alongside of the petition provision requiring the place of removal to be named therein. In the report of the joint committee referred to, and following these county-seat provisions there found, we find in parenthesis the following: "The foregoing sections of this article are intended to take the place of chapter 53, '89, and chapter 56, '90, and §§ 565 to 570 Comp. Laws." And this report as to this Code is prefaced by the following words: "Political Code. Proposed changes in the law shown by the report of the revision commission *which relate to substantive law and amount to new legislation.* Report of joint committee." This Political Code was introduced as house bill 165, and was amended during its passage by the addition, by senate amendment, of the requirement for verification of petition by each signer; found at page 409 et seq of Senate Journal, with other amendments to other legislation all concurred in by the house on conference committee report. See House Journal 812, 813. (For *data* of this legislation, consult House Journal 1895, pp. 45, 60, 80, 184, 210, 249, 491, 533, 536, 590, 591, 778, 812, 813, and Senate Journal, pp. 409–412, 484–489, and 529.) But at no place in the journals of house and senate can it be found where this proposed law (embodied in the report by bill of the revision commission, and thereafter reported by the joint committee of the two houses) was amended by the striking therefrom of the words "to the place named in the petition." The only evidence thereof must arise by presumption from the line made by pen through the words "to the place named in the petition," which words so stricken are found to have been in both the enrolled bill and the (joint committee) report. It must have been reported out of the revision committee with the words "to the place named in the petition" included in the report; otherwise the report of the joint legislative committee, based on the report of the revision committee, would not have contained said words printed therein as they appear under § 2010 of the appendix to the

22 N. D.—15.

House Journal. And we might remark in this connection that this legislation, enacting our Political Code, has never been engrossed.

From the foregoing undisputable facts in the history of this legislation, it is established beyond cavil that removal statutes, identical with those then under consideration by the Montana legislature, were by the revision committee reported to and acted upon by our legislature. Whether this bill was the original product of the revision committee of this state, thereafter becoming a law in Montana a week before enacted here, or was conceived in Montana and became a statute here as borrowed enactment from that state, is wholly immaterial, except as it may be of interest from an historical standpoint. The crucial decisive fact remains, that in its original form, from whatever source obtained, this was a removal statute as distinguished from a relocation one; and of equal importance is the additional fact that the legislature understood that this bill was new legislation, and understandingly enacted it as such, and have left the same so designated on their legislative journals of that year to aid in its construction. Whether the omitted words "to the place named in the petition" were stricken unauthorizedly from the bill as it is officially reported to have existed when in progress through the legislature, or whether amended without note thereof, it is not necessary to determine. But the important, uncontrovertible fact exists that it was new legislation, and not amendment of existing law. It was a change from old to new, and not a continuation of the old with amendment. When so construed as originally introduced, there is no chance for ambiguity, and every portion of the statute is plain and simple, of harmonious construction, making all of it effective, including its requirement that there be an official ballot provided as under general law required, and that this official ballot contain thereon the names of the proposed places for county seat from which the voter makes his choice by placing opposite the name of the place on the ballot the mark X as plainly required.

With these ballot provisions mandatory in terms and to be so construed, no compliance could be had if the theory of the appellants should be sustained. Such a holding would overlook the express repeal of the old relocation statutes with its right of designation of a choice, as explained in the main opinion in this case. And, pursuing the appellants' contention to the end, no ballot could be prepared that would not be

open to question on the ground of its being restrictive, unless it be held that, ignoring the repeal of the statute giving the power to designate, such right still remains to the voter, regardless of its express repeal. To hold with appellants we would be obliged to shut our eyes to the history of this legislation, ignoring the fact that the law being construed was introduced as a removal statute, and had the same been enacted as reported on the legislative journals would have absolutely barred the possibility of the appellants' contention. Further, we would be obliged to read into the law a right legislated against by repeal of the very power to designate formerly existing with the right to ballot, and in so doing ignore, again, that this is concededly new legislation enacted as a departure from that formerly existing. And, lastly, we would be obliged to turn from a statute enacted as an intended for a removal statute and as such a complete, definite, usable, and an harmonious and perfect piece of legislation, to a construction making it into an incomplete statute containing uncertainty at every step from petition to the manner of exercise of franchise; so much so that the attorneys who now urge this construction have heretofore, in State ex rel. Miller v. Norton, 20 N. D. 180, 127 N. W. 717, appeared before this court asserting thereunder a failure on the part of the legislature to provide a ballot or the manner of exercise of franchise in such an election, and virtually asking this court to supplement by construction such legislative omission. This alone is strong argument against this court perpetuating further uncertainty in county-seat removal matters by construing this statute as appellants deem the exigencies of this case imperatively demand to sustain their contention. Again, unless it be held that the official ballot desired by appellants shall contain but the name of the old county seat, with the voter the right to designate without statutory sanction any other place as his choice, by sticker or writing upon an official ballot, certain it is that no ballot can be prepared that will not be open to attack on the ground that the same restricts the choice of the voter in the exercise of this franchise in the matter of county-seat choice. An official ballot must be provided by or under direction of the county auditor. If, perchance, on such a ballot he should print the names of a dozen of the leading cities or towns of Pembina county, with intent to cover every possible place that could be considered a contender for the county seat, by what authority, other than the arbitrary caprice of such official,

would such names be so placed upon an official ballot for such purpose? Plainly none whatever. And did any legislature ever intend so important a franchise should go ungoverned and unguided, and wholly subject to arbitrary unofficial action? It is beyond rational belief. Again, if the election be had with such a ballot, unless it can be said that the voter has the right to choose some place other than a place designated on the ballot, an omitted thirteenth village in the county could overturn the election on the identical claim now urged, that such omitted place is restricted from untrammeled competition for county-seat honors, and so on *ad infinitum*. This would be in defiance of the fact that the right to so nominate a choice, as well as vote for it, has been knowingly withdrawn by the repeal of a statute formerly granting it, and for which has been substituted our present one limiting the right of the voter to the act of placing his mark on the official ballot after the name of the place thereon he prefers, with no power granted to add to the ballot. Appellants' construction must needs fly in the face of such declared statutory repeal, and manifestly disregard plain legislation, thereby overriding, instead of interpreting, the law.

In their brief appellants appear solicitous lest we judicially legislate, and charge that the construction of the statute above given places therein by said manner and means the words "to the place named in the petition." It is elementary that a construction requiring an addition amounting to what is so termed judicial legislation cannot be adopted. To this charge we plead not guilty. To appellants the statute may be, as counsel say in their brief, "so plain that he who runs may read," but still counsel has most exhaustively briefed this statute, so plain to them. And a part of what is said in such brief we hereby adopt as sufficient answer to such criticism, as to judicial legislation, and as authority for what has been done in construing this statute broadly from its four corners, aided by the history of its enactment. We refer to §§ 215 et seq. of Sutherland on Statutory Construction, as follows: "The statute itself furnishes the best means of its own exposition, and, if the intent of the act can be clearly ascertained from a reading of its provisions and all its parts may be brought into harmony therewith, that intent will prevail without resorting to other aids or construction. . . . The true meaning of any clause or provision is that which accords with the subject and general purpose of the act and every other part." This

is all we have endeavored to do. And regardless of whether the phrase "to the place named in the petition" legally belongs in as a part of the statute as enacted, or whether it was omitted properly in the printing of the Codes, or whether omitted by amendment, either intentionally or unintentionally, we have construed the statute as we find it (N. D. Codes, 1905, § 2359), as a part of and in connection with the entire legislation on said subject at the time enacted. And, when the statute interpreted is read as a whole with reference to all of its provisions, it appears almost so clear to this court "that he who runs may read," and that the meaning of the law as printed in the Revised Codes is identical with the meaning such county-seat legislation would have had had the words "to the place named in the petition" been retained. Therefore we are forced to construe this county-seat legislation as one enactment and as a removal statute; that the petition required by § 2359 must, instead of being in blank, contain the name of the place to which county-seat removal is proposed to be had; that this petition when presented to the county commissioners, when signed and properly verified by electors in number at least three fifths of those voting at the last preceding election, confers upon the commissioners jurisdiction to determine the matters necessary to submit the county-seat removal petitioned for to the voters of the county. This issue is then submitted upon a ballot containing thereon the names of the old and the proposed new county seat. In voting thereon the voter, complying with the commands of § 2361, Codes 1905, using an official ballot prepared and furnished as are other official ballots, evidences his choice for county seat by making his cross-mark after the name thereon he prefers, and, in the event of the requisite number of voters thus legally expressing a desire for removal of county seat to the proposed new site, removal thereto is to be had, all as provided by law .

We reaffirm what was said in the original opinion as to the action of the county commissioners on the presentation of the petition for removal. They were under no obligation to postpone action without some reason therefor recognized by law as imposing upon them the duty to continue the hearing on the petition. Under the record in this case, not a single fact appears from which fraud or illegality in the petition itself can be inferred, much less be considered as established. And we have before us the specific findings of the county commissioners, the

body authorized by law to pass on the facts, and these findings support the petition, and, besides, are not attacked. The presumption of law is in favor of, and not against, the regularity of performance of official conduct. We cannot then conclude, as do appellants, that the filing of the petition made it the duty of the board to desist from its examination and the determination of the matter petitioned for, until certain persons interested in county-seat removal had examined the petition, verified the signatures thereon, and otherwise satisfied themselves of the very matters their representatives, the board, are required to do in their behalf in impartially safeguarding all public interests.

In the petition for rehearing, appellants' counsel criticized the portion of the opinion dealing with the practice question, raised by respondents' counsel, and insist that they, appellants, are entitled to a decision on such question never raised by them. Our answer is that all questions are fully decided so far as this litigation is concerned, and such decision is binding on all concerned. The remedy here invoked by appellants was, for the purpose of this appeal, conceded by the court to be correct, and we are unable to see how appellant's counsel are in a position to complain of such decision as to remedy invoked; it being favorable to their contention.

The order appealed from is affirmed. Let judgment be so entered.